FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JASWINDER SINGH, | No. 23-95 |
| *Petitioner*, | Agency No. A216-276-233 |
| v. | |
| MERRICK B. GARLAND, Attorney General, | OPINION |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted December 5, 2023
Seattle, Washington

Filed October 4, 2024

Before: N. Randy Smith, Gabriel P. Sanchez, and Salvador
Mendoza, Jr., Circuit Judges.

Opinion by Judge Sanchez;
Dissent by N. Randy Smith

# SUMMARY[*]

## Immigration

The panel granted Jaswinder Singh's petition for review of a decision of the Board of Immigration Appeals affirming the denial of his application for asylum, holding that the Board erred in its adverse credibility determination and its internal relocation analysis.

The panel held that in concluding that Singh was not credible the agency misapplied *Matter of R-K-K-*, 26 I. & N. Dec. 658 (BIA 2015), which permits consideration of strikingly similar affidavits submitted by asylum applicants in unrelated proceedings as a basis for an adverse credibility determination. First, the agency erred by relying solely on non-unique factual similarities between Singh and other unknown declarants from India, without considering appropriate factors such as the use of similar words or phrases, distinct language and grammar, syntax, and narrative structure, or other cues that would suggest the affidavit was plagiarized. Additionally, there were serious concerns about the government's unreliable chart and its methodology in selecting declarations for comparison. Finally, the government's submission of declarations with redacted identifying information about the declarants, including their names and the location and dates of their attacks, raised due process concerns because Singh had no way to determine who the declarants were or explain

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

why their factual allegations may have been similar to his own.

Addressing the agency's internal relocation analysis, the panel held that the agency erred by failing to hold the government to its burden of proving that Singh could safely engage in Mann Party activities in areas outside of Punjab. The agency also relied on improper speculation in concluding that violence against Mann Party members, particularly outside of Punjab, was rare. Finally, by focusing solely on whether officials within Punjab would follow Singh to a new region, the agency failed to consider whether Singh may face persecution outside Punjab from local authorities, or other actors, based on his *future* political activities.

The panel remanded for the BIA to conduct a renewed credibility determination under *Matter of R-K-K-*, and to conduct a sufficiently individualized analysis of whether Singh could safety and reasonably relocate outside of Punjab if he continues to engage in Mann Party activities.

Dissenting, Judge N.R. Smith wrote that because Singh did not meaningfully challenge any of the IJ's internal relocation findings in his opening brief, those issues should be deemed forfeited and his petition should fail on that basis alone. Moreover, in addressing the agency's internal relocation analysis, the majority raised new arguments Singh never made and then found contrary evidence in the record to refute the IJ's findings, while ignoring the IJ's findings of fact, and more importantly, the appropriate substantial evidence standard of review.

Judge N.R. Smith wrote that in addressing the agency's credibility determination, the majority cherry picked facts, manufactured arguments, ignored the standard of review,

and improperly substituted its decision for that of the IJ. The majority also read *Matter of R-K-K-* too narrowly in concluding that it applied only to applications and declarations containing similar language, grammar, and spelling. Additionally, the majority inappropriately created new requirements for the government's methodology in selecting declarations for comparison.

---

## COUNSEL

Alexandra K. Jacobs (argued) and Jagbir S. Terkiana, Terkiana PC, Sunnyvale, California; for Petitioner.

Roberta O. Roberts (argued) and Craig W. Kuhn, Trial Attorneys; Eden L. Patton, Law Clerk; Jonathan A. Robbins, Assistant Director; Office of Immigration Litigation; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

SANCHEZ, Circuit Judge:

Jaswinder Singh, a citizen and native of India, appeals the Board of Immigration's ("BIA") decision affirming the Immigration Judge's ("IJ") denial of his petition for asylum.[1] He argues that the agency erred by misapplying *Matter of R-K-K-*, 26 I. & N. Dec 658 (BIA 2015), which permits immigration judges to consider strikingly similar affidavits submitted by asylum applicants in unrelated proceedings as a basis for an adverse credibility determination. Singh also challenges the agency's alternative finding that he could reasonably relocate within India. We agree that the agency erred in both respects.

As *Matter of R-K-K-* itself and decisions from other circuit courts have emphasized, an analysis of inter-proceeding similarities involves more than just comparing factually similar events. *Matter of R-K-K-* addresses similarities in the way events are described in the affidavits, such as the use of identical words or phrases, distinct language and grammar, or other cues that suggest the affidavit was plagiarized. The agency misapplied *Matter of R-K-K-* by relying solely on non-unique factual similarities between Singh and other unknown declarants from India to make an adverse credibility finding. The agency further

---

[1] The agency also denied Singh's claims for withholding of removal and relief under the Convention Against Torture. Because Singh's opening brief only challenges the denial of asylum, any other challenges are waived. *Hernandez v. Garland*, 47 F.4th 908, 916 (9th Cir. 2022) (Issues not "specifically and distinctly" argued in opening brief may be deemed forfeited. (quoting *Velasquez-Gaspar v. Barr*, 976 F.3d 1062, 1065 (9th Cir. 2020))).

erred in its relocation analysis by failing to hold the government to its burden of proof that Singh could safely engage in Mann Party activities in areas outside of Punjab. We grant the petition and remand to the BIA for further proceedings consistent with this opinion.

**I.**

Before coming to the United States, Singh lived in the Punjab region and worked as a farmer. On April 13, 2016, Singh joined the Shiromani Akali Dal (Amritsar) ("Mann Party"). The Mann Party advocates for a separate state of Khalistan and for the rights of Sikhs. As a member of the Mann Party, Singh attended rallies, hung posters, engaged in community service, and participated in recruitment efforts.

Singh testified that he was attacked twice in 2017 because of his Mann Party activities. On August 20, 2017, Singh was hanging posters for a Mann Party blood donation camp when he was approached by a car with four members of the opposition Indian National Congress Party ("INC"), whom he recognized by the INC logo on the car and from an INC rally he had observed. The four men exited the car and asked Singh why he was putting up posters. Singh explained that the Mann Party was organizing a blood donation drive. The men told him to stop putting up posters, join the INC, and offered to give him money and illicit drugs to sell if he did so. When Singh refused, the four men threw him on the ground and beat him with wooden sticks, hockey sticks, and baseball sticks for four to five minutes. The men only stopped when a group of six or seven witnesses intervened to help Singh. The INC members told Singh that if they found him again, they would kill him. Singh received medical treatment, including bandages and injections for the pain, and remained on bed rest for 20–25 days. He sustained

internal injuries, bruising, and a head injury that required stitches. Singh, his father, and a third individual went to the police to report the incident. The police refused to file a complaint because the attackers were members of the INC, the political party in power at that time. Singh was told that he would be arrested if he came back to the police.

On October 19, 2017, Singh was attacked again by four INC members while returning from a religious meeting. The INC members told Singh to leave the Mann Party, threw him to the ground, and started beating him. One person held a weapon to his head. Laborers in a nearby field observed what was happening and came to help. One of the attackers threatened that if they found Singh again, they were going to shoot and kill him. Singh received medical treatment for his injuries.

Following these attacks, INC members came looking for Singh at his home three or four times, asking his friends and others about Singh's whereabouts. They could not locate Singh because he was hiding on his farmland. With the help of his father and his father's friend, Singh entered the United States on or around January 14, 2018. Singh is still a member of the Mann Party and testified that he would continue to work for the party if he were to return to India.

Singh timely filed his application for asylum on June 22, 2018. At the end of Singh's hearing, the IJ noted that he was "concerned about this case because it seems to mirror many cases coming from the same region that I have encountered, and . . . I have some credibility concerns on that basis." The IJ requested supplemental briefing from the parties concerning *Matter of R-K-K-* and allowed additional documentary evidence to be submitted on this issue. Along with its *Matter of R-K-K-* brief, the government submitted

twenty redacted declarations from other asylum seekers from India who alleged political persecution by the INC, the Bharatiya Janata Party (BJP), or the Shiromani Akali Dal Badal party, based upon their membership in a variety of different political parties, including the Indian National Lok Dal Party and the Mann Party ("RKK Declarations").

The government also prepared a demonstrative chart comparing the factual allegations in Singh's affidavit to categories of allegations present in many of the RKK Declarations. The demonstrative chart displayed columns such as "Respondent hanging posters," "Respondent then approached by opposing party," "Opposing party attempts to recruit," "Respondent declines," "Respondent then punched, kicked, threatened," "Report to police after first attack," "Police refuse complaint," "Police threaten with arrest," "Respondent then attacked while traveling home from event," "Attacked with sticks of some kind," "Saved by strangers (usually farmers)," "Internal injuries," and "Family sends them to USA." Below each column, the chart depicted with a checkmark which of the twenty RKK Declarations shared in that factual similarity. Based on these comparisons, the government's supplemental brief asserted that "[Singh's] core facts of persecution are identical, or nearly identical" to those contained in the redacted declarations. Although the twenty declarations varied from each other and from Singh's declaration in different ways, the government did not explain how it had chosen these particular categories or what criteria it used to conclude that the declarations were "nearly identical" to Singh's evidence.

Singh filed his response to the government's *Matter of R-K-K-* submission, arguing that there were only "generalized non-unique similarities" between the declarations that did not warrant an adverse credibility

determination. Singh argued that "[i]n India recruiting other opposition members of a political party is not unique and neither is [the] threat of violence or violence upon declining" those recruitment efforts. Nor was it unique or distinctive that opposition party members would use "sticks and rods as weapons" or that the police in Punjab would refuse to take a report of the violence. Singh also identified several dissimilarities between his declaration and the RKK Declarations, pointing out that only three of the twenty declarations involved allegations of persecution of Mann Party members by members of the opposition INC Party.

On August 9, 2021, the IJ denied Singh's applications for asylum, withholding of removal, and relief under CAT. The IJ found Singh not credible based on "similarities between the respondent's testimony and that of respondents in other removal proceedings." The IJ noted that Singh and a varying combination of the other declarants "were low-level workers of their political party," were hanging posters for a party event, were approached by members of an opposing party usually in a car, were asked what they were doing and instructed to leave the party and join the opposing party, were asked to sell drugs, were attacked or threatened twice with slaps, punches, kicks, or hits with wooden or hockey sticks, were aided by witnesses, "went to a doctor… and received medical treatment," went to the police and were refused after the first attack, and fled India with family assistance.

The IJ also found Singh to be evasive and non-responsive, particularly concerning his testimony about how he had crossed the border. The IJ reviewed Singh's corroborating evidence, comprised of declarations from family and community members and county conditions evidence, and found it insufficient to overcome his

credibility concerns.  Finally, the IJ concluded that even if Singh had testified credibly, the government met its burden to show that Singh could relocate to another area of India to avoid persecution.

On January 3, the BIA dismissed Singh's appeal, citing *Matter of Burbano*, 20 I & N. Dec. 872, 874 (BIA 1994). The BIA held that the IJ properly applied *Matter of R-K-K-* by providing Singh "meaningful notice" of the alleged similarities and a "reasonable opportunity to explain before making a credibility determination based on the totality of the circumstances."  It found the IJ's adverse credibility finding was not clearly erroneous, rejecting Singh's argument that the "striking similarities" were "actually generalized and not unique factual circumstances."  Finally, the BIA found that even if Singh had testified credibly, the IJ properly determined that the government met its burden of rebutting the presumption of future persecution.  It found that the IJ's relocation findings were not clearly erroneous because it was unlikely that Singh would be targeted outside of Punjab as "a low-level supporter of the Mann Party and a non-violent advocate."  This petition for review followed.

## II.

We have jurisdiction under 8 U.S.C. § 1252.  We review questions of law de novo, and factual findings under the substantial evidence standard.  *Regalado-Escobar v. Holder*, 717 F.3d 724, 726–27 (9th Cir. 2013).  The agency's findings of fact are considered "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Ruiz-Colmenares v. Garland*, 25 F.4th 742, 748 (9th Cir. 2022) (cleaned up).  Where the BIA cites *Matter of Burbano* and also provides its own review of the

evidence and the law, the court reviews both the IJ and the BIA's decision. *See id.*

### III.

"Under the REAL ID Act, . . . the IJ is authorized to base an adverse credibility determination on the totality of the circumstances and all relevant factors." *Manes v. Sessions*, 875 F.3d 1261, 1263 (9th Cir. 2017) (per curiam) (internal quotation marks omitted). A finding of adverse credibility may be premised on an applicant's "'demeanor, candor, or responsiveness' as well as the consistency between an applicant's statements and other evidence in the record." *Iman v. Barr,* 972 F.3d 1058, 1065 (9th Cir. 2020) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). "Speculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Shah v. INS*, 220 F.3d 1062, 1071 (9th Cir. 2000).

Whether an IJ may consider notable similarities between affidavits submitted by asylum applicants in unrelated proceedings has long percolated throughout our nation's courts and immigration proceedings. In *Mei Chai Ye v. U.S. Dep't of Justice*, the Second Circuit first considered the credibility implications of two unrelated asylum applications that originated from China, each of which contained affidavits with striking similarities in their narrative structure, wording, and grammar. 489 F.3d 517, 522 (2d Cir. 2007). Both petitioners were represented by the same attorney. *Id.* at 520–21. In comparing the two asylum affidavits, the IJ found "twenty-three separate places at which the two affidavits were strikingly similar in language and grammatical structure," with "similar phrasing and … vocabulary," and where the "identical portions appeared . . . in the exact same order in both affidavits." *Id.* at 521–22.

The IJ reasonably concluded that the affidavits were "so blatantly similar in both form and substantive details" such that they "could not have been the result of honest applicants inserting truthful information into standardized templates." *Id.* at 525.

*Mei Chai Ye* cautioned, however, about "the "dangers inherent in relying on inter-proceeding similarities." *Id.* at 526. "To assume that one asylum applicant is responsible for, or even aware of, the striking similarities that appear in an unrelated applicant's submissions is much more problematic" than relying on internal inconsistencies within the same proceeding. *Id*. at 519-20. The Second Circuit explained that there are many ways in which substantially similar affidavits from unrelated asylum applicants may have an innocent explanation: (1) "both applicants have inserted truthful information into a similar standardized template"; (2) "the different applicants employed the same scrivener, who wrote up both stories in his own rigid style"; (3) the other applicant "plagiarized the truthful statements of the petitioner"; or (4) "the similarities resulted, not from the original documents themselves, but rather from inaccurate or formulaic translations—which unaffiliated applicants would not be in a position to discover or contest." *Id*. at 520, 526. Because the IJ carefully followed procedural safeguards that gave the petitioner an opportunity to explain or contest the similarities, and the IJ took pains to ensure that these similarities were not the result of mere coincidence, the court upheld the agency's adverse credibility determination. *Id.* at 527. In doing so, *Mei Chai Ye* urged the BIA to develop appropriate guidelines for analyzing inter-proceeding similarities in future immigration cases. *Id.* at 526.

The BIA formalized those guidelines in *Matter of R-K-K-*. The respondent there was an asylum seeker from India

who alleged two incidents of arrest and abuse by the police in 2010. 26 I. & N. Dec. at 662–63. But his testimony rang some alarm bells. His brother, who had been granted asylum in 2009, used the "same or remarkably similar language" to describe acts of abuse by police years earlier. *Id.* at 661–63. The IJ observed that "both applications shared identical wording, typographical and spelling errors, and spacing irregularities in describing the same events." *Id.* at 664. Both declarations also used "the same distinctive descriptions of the alleged events," each alleging that police forced them to undress, beat them on their back and buttocks with sticks or batons, and pulled their legs apart during nighttime detentions. *Id.* at 663–65. In addition, the respondent's declaration used plural pronouns to describe just himself, whereas his brother's application properly used those same plural pronouns to describe violence against himself and his wife. *Id*. at 663.

On appeal, the BIA addressed whether "in making an adverse credibility determination, an [IJ] can consider significant similarities between statements submitted by applicants in different proceedings," and what procedural safeguards it should adopt "to preserve the fairness of the proceedings." 26 I. & N. Dec. at 659, 661. As in *Mei Chai Ye*, the BIA acknowledged the difficulty that these questions present. It noted that "some inter-proceeding similarities are so significant that, when left unexplained, they cannot be ignored," while cautioning that other "innocent similarities may be mistakenly interpreted as evidence of falsity." *Id.* at 661. Thus, the BIA resolved that IJs "may rely on inter-proceeding similarities as part of an adverse credibility determination, but we must also review such determinations with 'an especially cautious eye.'" *Id.* (quoting *Mei Chai Ye*, 489 F.3d at 519–20).

*Matter of R-K-K* adopted a three-part framework for adjudicating cases that involve inter-proceeding similarities: (1) "[T]he [IJ] should give the applicant meaningful notice of the similarities that are considered to be significant"; (2) "[T]he [IJ] should give the applicant a reasonable opportunity to explain the similarities"; and (3) "[T]he [IJ] should consider the totality of the circumstances in making a credibility determination. Each of these steps must be done on the record in a manner that will allow the [BIA] and any reviewing court to ensure that the procedures have been followed." *Id*. Applying this framework, the BIA determined that the IJ's adverse credibility ruling was not clearly erroneous. The "nearly identical wording" in the applications properly raised credibility concerns and the textual and narrative similarities were "too numerous and obvious to be coincidental." *Id.* at 665. The BIA further concluded that the IJ did not err in finding that the respondent's explanations for the "nearly verbatim statements" were insufficient and "not persuasive," and the IJ had given proper consideration to the totality of the circumstances and afforded the respondent ample opportunity to address these concerns. *Id.* at 665–66.

In setting out a framework to guide immigration judges on inter-proceeding similarities, it is clear that *Matter of R-K-K-* addresses similarities in the use of language, grammar and syntax, and narrative structure between affidavits that are so striking they call into question whether the affidavit has been plagiarized. In its discussion of the framework for analysis, the BIA explained:

> Identification of a substantial number of instances where the *same or remarkably similar language* is used to describe the same

kind of incident or encounter would tend to raise credibility questions that should be further addressed. This is particularly true where there is additional material in both statements that "wouldn't necessarily have to be mentioned but [was] mentioned." *Mei Chai Ye v. U.S. Dep't of Justice*, 489 F.3d at 521 (quoting the Immigration Judge). But the presence of even a relatively few similarities could raise the same credibility concerns if, in the context of the overall asylum claim, *distinct language* was used *or unique factual circumstances* were repeated without reasonable explanation. *See, e.g.*, *Dehonzai v. Holder*, 650 F.3d 1, 8 (1st Cir. 2011) (rejecting the applicant's explanation that *language describing a beating* with a bundle of wires attached to a tennis ball, which was "virtually identical" to his cousin's statement, was "mere coincidence").

*Id.* at 661 (emphasis added).

Accordingly, *Matter of R-K-K-* is concerned with more than just factually similar events. It instructs that the telltale signs of a canned or plagiarized affidavit are the ways in which events are described in the affidavit, such as the use of identical phrases or words, the same grammatical mistakes and punctuation, the use of distinctive language, or the unnecessary addition of extraneous detail. In *Dehonzai*, upon which *Matter of R-K-K-* relies, the First Circuit upheld an adverse credibility determination of an asylum applicant that "virtually copied" a story attributed to his alleged cousin in an Amnesty International Report. 650 F.3d at 6, 8. Not

only did the affidavit contain unique factual details about the alleged beating, claiming that his persecutors "beat [him] with a bundle of electric wire with tennis ball at the end, the ball continually struck my back [sic]," but the language "was virtually identical to the language attributed to [his cousin] within the Amnesty International report." *Id.* at 8.

Here, the IJ did not rely on any similarities in language, grammar, or narrative structure between Singh's affidavit and any of the twenty redacted declarations submitted by the government below. As the government concedes, Singh's affidavit substantially differs in its use of language, wording, and structure to describe the events in question. Instead, the IJ's "principal concern" was the alleged factual similarities between Singh's testimony and that of the RKK Declarations. The IJ found that because several unknown declarants from India had alleged that opposition party members attempted to recruit them while they were putting up political posters, they were beaten by sticks or rods, they were turned away by police and threatened with arrest, and they had to flee to the United States, Singh's own account of factually similar events lacked credibility.

We conclude that the agency misapplied *Matter of R-K-K-*. Relying exclusively on broad factual similarities to trigger credibility suspicion runs counter to the special caution required under *Matter of R-K-K-* and its express focus on finding striking similarities in the language, grammar and structure of related affidavits. 26 I & N. Dec. at 661–62. There are several problems with the way the agency approached its inter-proceeding analysis.

First, by focusing exclusively on broad factual similarities between the declarations, the IJ erred in applying *Matter of R-K-K-* too expansively. As required by *Matter of*

*R-K-K-*, the IJ did not identify any linguistic or grammatical similarities between Singh's declaration and the RKK Declarations that would suggest Singh's affidavit had been plagiarized, much less "strikingly similar" words or phrases or grammatical cues. While the agency has an interest in rooting out "canned" applications, *see Mei Chai Ye*, 489 F.3d at 524, relying solely on non-unique factual similarities to deem an applicant not credible undermines a fundamental principle of asylum law that persecution sometimes occurs through widespread or systematic actions by the government or by its acquiescence to third-party harm. *See Mgoian v. I.N.S.,* 184 F.3d 1029, 1035 (9th Cir. 1999) (a petitioner is eligible for asylum if they can "show a 'pattern or practice' of persecution against a group of which she is a member" (quoting *Kotasz v. INS*, 31 F.3d 847, 853 (9th Cir. 1994))); *Knezevic v. Ashcroft*, 367 F.3d 1206, 1213 (9th Cir. 2004) ("An applicant need not prove that he will be singled out for persecution if he can prove a pattern or practice of persecution of people similarly situated to the applicant, who are members of a protected group." (internal citations omitted)). That multiple asylum applicants from the same region of India might describe similar forms of persecution does not necessarily imply their accounts are false and should be discredited.

Second, instead of relying on the requisite similarities in language and grammar, the agency based its *Matter of R-K-K-* analysis on the government's unreliable demonstrative chart and declarations. The agency's reliance on this submission raises serious questions about its methodology. *See Mei Chai Ye*, 489 F.3d at 527 ("On the other hand, our holding indicates that we would view much more skeptically an adverse credibility finding by an IJ who, in relying on

inter-proceeding similarities, adopted a less rigorous approach than that employed by IJ Vomacka in this case.")

To begin, it is unclear how the government selected the declarations that formed the basis of its *Matter of R-K-K-* brief. The government provided "twenty redacted affidavits from other asylum cases originating from India" that purportedly "shared striking similarities" to Singh's declaration. Without knowing more about the government's selection process or the broader universe of asylum applications from India, it is difficult to draw any conclusions about the chosen twenty. Suppose the government had reviewed one hundred asylum declarations and found eighty to describe wholly dissimilar events. The IJ—or a reviewing court adopting a more rigorous approach—would conclude that this unrepresentative sample tells the court very little about whether Singh's affidavit was filled with canned statements or reflected true events.[2]

Equally unsound was the IJ's reliance on broad factual similarities that could be present in countless asylum applications. The government's demonstrative chart displayed columns such as "Respondent hanging posters," "Respondent then approached by opposing party," "Opposing party attempts to recruit," and "Respondent declines," followed by checkmarks indicating that most of

---

[2] Our dissenting colleague suggests that we have imposed a new requirement on the government "to disclose how they selected the [declarations]." Not so. We merely illustrate the problems that arise when the IJ relies on non-unique declarations of unknown provenance to make questionable "similarity" findings that are not grounded in "remarkably similar" language or grammar. It is the duty of a reviewing court to "review such determinations with 'an especially cautious eye.'" *Matter of R-K-K-*, 26 I & N. Dec. at 661.

the RKK Declarations shared in that similarity. Certain columns draw arbitrary distinctions about the same event; it is unclear why an opposition party's attempt to recruit and respondent's refusal represents two different factual circumstances. Other columns are so general as to be virtually meaningless, such as "Respondent then punched, kicked, threatened," "Police refuse complaint," and "Family sends them to USA." All viable claims for asylum are likely to allege that the applicant suffered some form of harm or threat of harm, the government participated in or acquiesced in that harm, and the applicant made their way to the United States to seek asylum relief. *See* 8 U.S.C. §§ 1158(b), 1101(a)(42)(A). Tallying the number of checkmarks for these non-unique categories does not convert this process into a rigorous one. Indeed, it largely reveals its arbitrariness.

The IJ concluded that "the R-K-K- declarations are not merely similar; they contain slight variations on essentially identical events occurring in essentially identical order and recounted in essentially identical manners." The IJ did not explain, however, which variations or events he found "slight" or important, or whether he simply engaged in a number-counting exercise. There is no discernible methodology to the IJ's determination that Singh's affidavit was "essentially identical" to an amalgamation of twenty other declarations.[3]

---

[3] Our court has granted several petitions for review by Mann Party members who alleged very similar claims of persecution. *See Singh v. Garland*, 57 F.4th 643, 649 (9th Cir. 2022) (attacked twice by INC members and suffered internal injuries); *Singh v. Whitaker*, 914 F.3d 654, 657 (9th Cir. 2019) (attacked twice by INC members when

Nor did the IJ discuss significant differences between Singh's affidavit and the other declarations. As Singh points out, only three of the twenty declarations involved allegations of persecution of Mann Party members by members of the opposition INC Party. The IJ did not explain why it was appropriate to lump together alleged acts of persecution by members of the INC, BJP, and Shiromani Akali Dal Badal party against various opposition party members such as the Mann Party and Indian National Lok Dal Party. Singh also raised other distinct factual circumstances—such as being threatened with a gun and receiving stitches for his injuries—that the IJ did not consider in its comparison.

Finally, the agency's misapplication of *Matter of R-K-K* raises due process concerns that were not present in *Matter of R-K-K*, *Mei Chai Ye,* or *Dehonzai*. Due process in removal proceedings requires "a full and fair hearing of [a petitioner's] claims and a reasonable opportunity to present evidence on his behalf." *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000). A meaningful opportunity to be heard "helps 'minimize substantively unfair or mistaken deprivations'" and "preserves the 'high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference.'" *Wright v. Beck*, 981 F.3d 719, 727 (9th Cir.

---

returning from a Mann Party blood drive, requiring hospital treatment); *Singh v. Garland*, 97 F.4th 597, 600 (9th Cir. 2024) (attacked twice by BJP members, including when he was returning home after prayer at a Sikh temple); *Kumar v. Garland*, 110 F.4th 1149, 1153-54 (9th Cir. 2024) (attacked twice by BJP members while hanging posters and while working at a camp, was treated at the hospital, and was threatened by the police). Under the IJ's flawed analysis, these similarities alone would be enough to discredit their claims.

2020) (quoting *Fuentes v. Shevin,* 407 U.S. 67, 81 (1972)). A finding of adverse credibility is generally based on discrepancies found within the record precisely because "asylum claims ordinarily are centered around events and circumstances that the applicants have experienced directly . . . ." *Lai v. Holder*, 773 F.3d 966, 973–74 (9th Cir. 2014).

Because the RKK Declarations redacted identifying information about the declarants, including their names and the location and dates of their attacks, Singh had no way to determine who the declarants were or explain how their factual allegations may be similar to his own. To rebut the suggestion of plagiarism, Singh argued before the IJ that "there is no evidence that [the RKK declarants] including [Singh] knew each other or had any opportunity to share any of the information in their declaration." He instead presented declarations from his father, a neighbor, witnesses from the attack, and local leaders, all of whom corroborated Singh's testimony. The IJ found that "[w]hile the declarations are consistent with [Singh's] testimony, they do not explain the numerous similarities between the respondent's testimony and the R-K-K- declarations[.]" As with Singh's own testimony, the IJ did not explain how Singh's declarants could account for the alleged similarities between Singh's affidavit and the unknown declarants, and it is unclear what other evidence Singh could have provided to assuage the IJ's concerns.

Contrast what happened below with the other cases. The declarants in *Matter of R-K-K-* were brothers who both used the same translator and gave conflicting testimony about the preparation of the application. 26 I. & N. Dec. at 663–64. The declarants in *Mei Chai Ye* employed the same lawyer who later withdrew his representation because of potential conflict. 489 F.3d at 520–22. In *Dehonzai*, the petitioner's

affidavit was nearly identical to that of his alleged cousin's report in Amnesty International.  650 F.3d at 3–4.  When an inter-proceeding analysis is properly confined to questions about strikingly similar language and grammar used in two affidavits, and there is some basis for the IJ to determine whether the similarities may be the result of the "same scrivener" or translator or a stock template, *see Mei Chai Ye*, 489 F.3d at 520, the asylum applicant has a meaningful opportunity to address the similarities.  Here, the agency's reliance on the redacted declarations did not afford Singh a meaningful opportunity to offer "reasonable explanation or credible evidence to dispel doubts about the authenticity or reliability of the initial evidence."  *Matter of R-K-K-*, 26 I. & N. Dec at 662.  Accordingly, the agency misapplied *Matter of R-K-K-* by basing its adverse credibility finding exclusively on non-distinct factual similarities.[4]

Our dissenting colleague's contention that we have manufactured arguments for Singh is mistaken.  Singh properly challenged the agency's misapplication of *Matter of R-K-K-* before the agency, making the same point that

---

[4] The IJ also found that Singh was nonresponsive and evasive regarding his entry to the United States, and that corroborating country condition evidence did not overcome the adverse credibility concerns.  We need not address these non-dispositive findings because the IJ relied on them only to "buttress" its adverse credibility determination made "on the basis of the similar statements alone."  Even so, the IJ's evasiveness finding is not supported by the record.  Not entering the United States at a port of entry because no one was there and not knowing where to cross the border are not inconsistent statements, but rather build upon Singh's explanation that he simply followed the instructions given by his traveling companion when he arrived at the border.  *See, e.g.*, *Kumar v. Garland*, 18 F.4th 1148, 1154 (9th Cir. 2021) (observing that "[b]eing 'beaten on [one's] arms and legs' is not inconsistent with being 'beaten all over [one's] body.'").

*Matter of R-K-K-* requires "[t]he identification of substantial number of instances where same or 'remarkably' similar *language* is used to describe same type of incidents, particularly if the comparative statements state things which need not to be mentioned but are mentioned."  Elsewhere, Singh argued before the agency: "Here, the similarities that the Department recognizes are not unique nor is there a presence of distinct language when all declarations are reviewed."  To the extent the dissent suggests that these arguments were waived or not properly presented for our review and analysis, our colleague is incorrect.

"Our traditional rule is that '[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.'"  *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1994) (*quoting Yee v. City of Escondido*, 503 U.S. 519, 534 (1992)).  As the Supreme Court explains, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *see also Elder v. Holloway*, 510 U.S. 510, 514–15 (1994) (holding that appellate courts may rely on legal authorities not cited by the parties where relevant to a legal determination).  In short, parties present issues and claims for determination, not specific arguments or theories, and Supreme Court authority makes clear that we are not limited to the particular arguments raised by the parties in resolving the proper application of governing law.

At bottom, the dissent misapprehends that when the agency commits legal error, as it did here in its

misapplication of *Matter of R-K-K-*, "we do not ignore the error to see if substantial evidence nevertheless supports the agency's determination." *Singh v. Garland*, 97 F.4th at 609. The appropriate remedy is to remand to the agency to apply the correct legal standard. *See Knezevic*, 367 F.3d at 1214–15 (remanding where agency failed to take into consideration several regulatory factors in evaluating internal relocation); *Mashiri v. Ashcroft*, 383 F.3d 1112, 1122 (9th Cir. 2004) (remanding where IJ erroneously "placed the burden of proof regarding internal relocation on the petitioner"); *Garcia v. Wilkinson*, 988 F.3d 1136, 1147 (9th Cir. 2021) (remanding where BIA applied erroneous legal standard to its nexus analysis); *Barajas-Romero v. Lynch*, 846 F.3d 351, 360 (9th Cir. 2017) ("Because the BIA accepted the government's view under the wrong [nexus] standard, we remand to the BIA to decide the case under the correct standard: "a reason" rather than "one central reason."). We therefore remand to the agency to conduct an analysis that accords with *Matter of R-K-K-* and the special caution required of inter-proceeding similarities.

## IV.

The agency additionally erred in finding that Singh could avoid persecution by relocating to another area in India. "If past persecution is established, a rebuttable presumption of a well-founded fear arises, 8 C.F.R. § 208.13(b)(1), and the burden shifts to the government to demonstrate that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear." *Tawadrus v. Ashcroft,* 364 F.3d 1099, 1103 (9th Cir. 2004) (internal quotation marks omitted). Here, the agency afforded Singh the presumption of past persecution, which shifted the burden to the government to show by a preponderance of the evidence either a "fundamental change in circumstances" or

that Singh could "avoid future persecution by relocating to another part of [India], and under all the circumstances, it would be reasonable to expect [him] to do so." *Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1089 (9th Cir. 2005) (quoting 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B)). Although Singh testified that he planned to continue working for the Mann Party if he were to return to India, the government did not sustain its burden of proof that Singh could safely engage in Mann Party politics outside of Punjab.[5]

The agency must "conduct a 'reasoned analysis with respect to [Singh's] individualized situation' to determine if he could safely relocate within another area of India." *Singh v. Garland*, 97 F.4th at 607 (quoting *Singh v. Whitaker*, 914 F.3d at 661). We have described the relevant framework for assessing the government's burden of proof on relocation as follows:

> In *Singh v. Whitaker*, the government bore the burden of showing by a preponderance of the evidence that the petitioner could safely and reasonably relocate internally. *Id.* at

---

[5] The dissent's claim that Singh forfeited his challenge to the agency's internal relocation analysis is belied by the record. Singh's opening brief argues that "the Immigration Judge erred in finding that Petitioner could safely and reasonably relocate" because members of the INC who attacked him are both political rivals and government actors, making it unsafe for him to return anywhere in the country, citing *Singh v. Whitaker*, 914 F.3d at 659 and *Kaur v. Wilkinson*, 986 F.3d 1216, 1227 (9th Cir. 2021). He has adequately raised and developed his contentions on appeal. *See* Fed. R. App. P. 28(a)(8)(A). Because Singh properly challenged the agency's internal relocation determination, we are "not limited to the particular legal theories advanced by the parties" and "retain[] the independent power to identify and apply the proper construction of governing law." *Kamen*, 500 U.S. at 99. *See supra* 23.

659.  We concluded that the BIA erred in its relocation analysis for two reasons.  First, the BIA "erred by failing to address the potential harm [opposition party] members, or other local authorities, might inflict upon Singh in a new state." *Id.* at 661.  Second, we concluded that the BIA "failed to specifically address Singh's stated intent to continue proselytizing for his party wherever he went." *Id.*  "Thus, the BIA's analysis regarding whether Singh could reasonably relocate was inadequate." *Id.*  We remanded for the BIA to conduct a sufficiently individualized relocation analysis for petitioner's asylum and withholding of removal claims.

*Id.* at 607–08.

Here, the IJ's grounds for its relocation finding are not supported by the record.  First, the IJ found that Singh could safely relocate because Singh was only attacked in Punjab, and he had no difficulty traveling to New Delhi or leaving New Delhi through the airport.  But the record does not demonstrate—and the IJ did not rely upon—any evidence that Singh has ever lived in New Delhi or engaged in Mann Party activities on his travels there.  Singh's uneventful trip to New Delhi has no bearing on whether he faces a risk of persecution if he continues proselytizing for the Mann Party in another region of the country.

Second, the IJ determined that violence against Mann Party members, Sikhs, or pro-Khalistan activists was rare, particularly outside of Punjab, because two State Department country condition reports did not mention it.

The IJ reasoned that these groups did not experience "significant persecution" because he would "expect that, if Mann Party members, Sikhs, or Khalistan supporters were subject to nationwide harm, the reports would discuss the issues in some detail." The IJ's conclusion rested on impermissible speculation. *See De La Luz v. I.N.S.*, 713 F.2d 545, 546 (9th Cir. 1983) ("The record reflects nothing more than pure speculation on this point; the Immigration Judge was not justified in considering this bare speculation . . . ."). Violence against Sikhs and those who quietly hold pro-Khalistan views does not address Singh's asylum claim, which is premised on his active membership and participation in Mann Party activities. More importantly, an *omission* in the State Department reports about acts of persecution against Mann Party members does not support the inference that this form of persecution is "rare" or non-existent. The State Department reports do not purport to be comprehensive in their coverage of political and social issues within India. To permit this unsupported inference to be made would not shift the "appropriate burden" to the government to demonstrate that Singh could safely and reasonably relocate within India. *See Singh v. Whitaker*, 914 F.3d at 660. Indeed, the record contains some evidence of violence against Mann Party members, including a Canadian United Nations Committee Against Torture finding that Mann Party members have been harassed, arrested, and taken into "preventative detention" for engaging in party gatherings, public commentary, and planned demonstrations.

Third, the IJ's finding that even if Singh "continued to engage in political activism supporting an independent Khalistan, he would not be at risk of persecution by the Congress Party members or anyone else outside of Punjab"

is not supported by the record.  The BIA errs in its relocation analysis when it "unlawfully assum[es] that [a petitioner] could silence his political activity to avoid harm." *Singh v. Whitaker*, 914 F.3d at 660.  The IJ here found that because Singh was only a low-level, non-violent Mann Party member, it was unlikely he would be labeled as a high-priority target subject to tracing by INC forces were he to move out of Punjab.  "For the government to rebut the presumption of future persecution, it is not enough to show that Punjabi police or other actors are unlikely to follow Singh outside of Punjab because he is a low-level Mann party member and not a 'high-profile militant.'" *Singh v. Garland*, 97 F.4th at 608.  As we observed in *Singh v. Whitaker* and *Singh v. Garland*, that police in Punjab are likely to pursue only "high profile militants" outside of Punjab does not "shed light on the likelihood of harm when an individual continues to advocate for Mann Party activities in a new state." *Id.* at 608–09; *Singh v. Whitaker*, 914 F.3d at 661.  Focusing solely on whether INC officials within Punjab would follow Singh to a new region "does not account for the persecution [Singh] may face outside Punjab from local authorities, or other actors, based on his *future* political activities." *Singh v. Whitaker*, 914 F.3d at 661 (emphasis added); *Singh v. Garland,* 97 F.4th at 608.[6]

"On this record, the government has not carried its burden to show that Singh is unlikely to be harmed or targeted by local officials or opposition party members upon

---

[6] The IJ also found that INC members would not be able to track Singh down using the Aadhaar card or India's tenant verification system.  As discussed, whether the INC can trace Singh outside of Punjab does not answer the question whether local officials and INC members in other regions of the country are likely to target Singh were he to continue his Mann Party activities.

relocation based on his future political activities and advocacy for Khalistan succession." *Singh v. Garland*, 97 F.4th at 609. Indeed, the 2018 Department of Justice Report submitted by the government repeatedly acknowledges that "most reports do not specifically address the situation of how members of the [Mann] Party who relocate in fear of persecution are treated." The Canadian United Nations report gives mixed accounts about violence against Mann Party members outside of Punjab. On the one hand, it reports that "knowledgeable sources" stated active non-violent Mann Party members were not subject to "ill-treatment" unless they were suspected by the police of terrorism, extremism, or violence. On the other hand, other knowledgeable sources have reported harassment, arrest, and "preventative detention" of Mann Party members for their political activities. At best, the record presents equivocal evidence concerning the safety of Mann Party members to practice freely in other areas of the country.[7] Such thin evidence cannot sustain the government's burden of proof by a preponderance of the evidence that Singh can relocate safely to another part of India if he continues his active participation in the Mann Party. Remand to the BIA is appropriate to determine whether relocation is feasible in Singh's case.

---

[7] The government submitted an October 2020 version of the report, which the IJ cited elsewhere in its decision but not in its relocation analysis. The 2020 report does not alter our analysis. Like the 2018 report, the 2020 report acknowledges that there are very few reports of relocation of Mann Party members and cites the same Canadian United Nations report as its most salient evidence concerning relocation.

**V.**

We grant Singh's petition for review and remand for the BIA to conduct a renewed credibility determination under *Matter of R-K-K-*, and to conduct a sufficiently individualized analysis of whether Singh could safety and reasonably relocate outside of Punjab if he continues to engage in Mann Party activities.

---

Smith, N. Randy, Circuit Judge, dissenting.

Because an immigration judge (IJ) "may deny eligibility for asylum to an applicant who has otherwise demonstrated a well-founded fear of persecution where the evidence establishes that internal relocation is a reasonable option under all of the circumstances," *Melkonian v. Ashcroft*, 320 F.3d 1061, 1069 (9th Cir. 2003), I start my dissent where this case should have ended. The issue is straightforward: Does substantial evidence support the agency's decision that Singh can relocate internally to avoid persecution? The IJ found that Singh could internally relocate. Yet, rather than apply the standard of review to the agency's decision, my colleagues manufacture arguments and substitute their judgment for that of the agency in order to conclude that Singh cannot relocate. Thus, I must dissent.[1]

---

[1] I agree with my colleagues that Singh forfeited any challenge to withholding of removal and relief under the Convention Against Torture.

1. **The record does not compel the conclusion that Singh could not reasonably relocate to avoid future persecution.**

Starting with the government's burden of proof, "[w]hen an asylum applicant has established that he suffered past persecution, the burden is on the government to show by a preponderance of the evidence that the applicant . . . can reasonably relocate internally to an area of safety." *Singh v. Whitaker*, 914 F.3d 654, 659 (9th Cir. 2019). "Relocation analysis consists of two steps: (1) whether an applicant could relocate safely, and (2) whether it would be reasonable to require the applicant to do so." *Id.* (internal quotation marks and citation omitted). Here, these steps required the IJ to determine whether there was an area where Singh would not have a well-founded fear of persecution and to assess the "potential harm in the suggested relocation area, ongoing civil strife in the country, and social and cultural constraints, among others" to determine whether relocation was reasonable. *Id.*

The IJ and the BIA made both of these assessments. First, they concluded that Singh could relocate safely to a state not governed by the Indian National Congress Party ("INC" or "Congress Party"). Second, they concluded that relocation was reasonable. The BIA emphasized that Singh's arguments about police tracking him throughout India were not persuasive, because Singh was "a low-level supporter" and "a non-violent advocate." Thus, the BIA concluded it was unlikely that the police or members of the INC would pursue Singh outside of Punjab.

The IJ thoroughly assessed Singh's ability to relocate. The IJ made the following findings of fact with regard to whether there was "a specific area of the country where the

risk of persecution to [Singh fell] below the well-founded fear level." *See Matter of M–Z–M–R–*, 26 I. & N. Dec. 28, 33–34 (BIA 2012).

- Singh "can safely relocate to another part of India, particularly a state of union territory not governed by [the] Congress [Party]."
- Both attacks were "confined to a small area" near Singh's home.
- Singh traveled to Delhi prior to departing the country.
- Singh did not experience any harm when leaving the country.
- Singh used his own passport when he left India.
- Country condition evidence "indicate that violence against, or persecution of Mann Party members, Sikhs, or pro-Khalistan activists is rare, particularly outside of Punjab."
- "The India 2020 Human Rights Reports and the India 2020 International Religious Freedom Report do not mention harm against Sikhs and do not refer to the Mann Party or the Klialistan movement at all."
- "[I]f Mann Party members, Sikhs, or Khalistan supporters were subject to nationwide harm, the reports would discuss the issues in some detail." The IJ compared the lack of evidence with the evidence that Muslims face persecution nationwide.
- The Indian government in non-Congress controlled territories is willing and able to protect Mann Party members.
- "The country conditions reports also show that, even if the respondent continued to engage in political activism supporting an independent Khalistan, he

would not be at risk of persecution, by the Congress Party members or anyone else outside of Punjab."

- "Typically, outside of Punjab, only Mann Party members who are considered to be 'high profile militants' are at risk of persecution."
- Singh was "a relatively low-level member of the Mann Party."
- Singh did not engage in violence; "[h]e never carried a gun while he was in India and he never attended a meeting where he knew someone else had a gun or a bomb."
- Because India is composed of 28 states and 8 union territories, Congress Party member "would have difficulty, and potentially find it impossible, to locate [Singh]."
- Police outside of states not controlled by Congress Party would not favor Congress Party members.
- "The Congress Party members would [not ]be able to locate the respondent through the use of his Aadhaar card."
- "[D]espite concerns from citizens about potential privacy breaches and profiling, the Indian government claims it is impossible, due to technical and legal restrictions, to track citizens using the data collected from Aadhaar."
- "The Congress Party members are also unlikely to learn of the respondent's location through India's tenant verification system."

The IJ also considered the reasonableness of relocation. It found:

- "Punjabi Sikhs may legally relocate from Punjab to other parts of India."

- "There are sizable Sikh populations outside of Punjab, and Sikhs are able to practice their religion without restriction or discrimination."
- Singh can support himself.
- Singh "speaks Punjabi, as well as some Hindi and some English, the two *lingua francas* of the country."

On appeal to this court, Singh did not challenge any of these findings by the IJ. Instead, Singh's only challenges to the relocation findings are brief, so I include the whole of them here:

> As established above, under Ninth Circuit case law, Petitioner's INC persecutors are governmental actors. As one of two major political parties in India, the INC naturally exists and operates throughout India, even in states where it does not currently hold a majority of seats. Because Petitioner justifiably fears additional persecution from the government, internal relocation is not a viable way to avoid future persecution. As such, the [IJ's] decision must be reversed, and Petitioner must be awarded asylum.
>
> The Board completely neglected to review this element of the [IJ's] decision.

Let's examine these challenges. Let's take the easiest one first. Singh asserts the BIA erred by not addressing the IJ's decision. This argument is wrong. The BIA adopted the IJ's decision, and it also held that the IJ "thoroughly considered all the evidence, including country conditions information and the respondent's testimony, and conducted

an individualized analysis to conclude that the respondent could safely relocate outside of Punjab, especially to a state not governed by the Congress Party, and that it would be reasonable to expect him to do so under all the circumstances."

In his paragraph about relocation, Singh challenges the IJ's conclusion that he could safely relocate, because the INC party is a government actor and it is presumed that internal relocation would not be reasonable. Singh relies solely on case law suggesting that, when the government is the persecutor, internal relocation is not possible. Although (as case law provides) there is a presumption that internal relocation is not reasonable in those circumstances, statute and regulations provide that such a presumption can be rebutted by the government. *See* 8 C.F.R. § 1208.13(b)(3)(ii). As noted above, Singh does not challenge any of the IJ's findings that the government rebutted this presumption. Singh's arguments do not contain his "contentions and the reasons for them, with citations to the authorities and parts of the record on which [Singh] relies." Fed. R. App. P. 28(a)(8)(A). Because Singh did not meaningfully challenge any of the IJ's findings in his opening brief, those issues should be deemed forfeited and his petition should fail.**2** *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1259–60 (9th Cir. 1996).

---

2 My colleagues argue that Singh's general challenge was adequate to raise this issue on appeal. Maj. Op. at 25 n.5. Not so. We have consistently held that "[w]e review only issues which are argued specifically and distinctly in a party's opening brief." *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994). The reason we do not consider a petitioner's inadequately developed arguments or bare assertions is

Because Singh failed to meaningfully challenge the BIA's and the IJ's decision, my colleagues leap to assist him to make arguments he never made. My colleagues highlight (1) the IJ's observation that Singh was not harmed in New Delhi when he left the United States; (2) the IJ's observation that the absence of evidence in country condition reports suggested that persecution against Mann Party members was not nationwide; and (3) the IJ's observation that "Singh was only a low-level, non-violent Mann Party member," that would not be targeted by the INC party outside of Punjab. Maj. Op. at 24–29. They raise these new arguments on Singh's behalf and then find contrary evidence in the record to refute the IJ's findings. In doing so, they also ignore all of the IJ's findings of fact and, more important, the substantial evidence standard of review. They assert, "At best, the record presents equivocal evidence concerning the safety of Mann Party members to practice freely in other areas of the country. Such thin evidence cannot sustain the government's burden to prove by a preponderance of the evidence that Singh could relocate safely to another part of India if he continues his active participation in the Mann Party." Maj. Op. at 29. This statement completely disregards the substantial evidence standard of review. *Cf. Soto-Soto v. Garland*, 1 F.4th 655, 660 (9th Cir. 2021) (explaining that

---

because it is not our job to "manufacture arguments for an appellant." *Id.* Yet, that is exactly what my colleagues have done here.

Moreover, Singh did not exhaust the issues raised by my colleagues on appeal to the BIA. There, Singh asserted that he could be tracked by his identification and that, because his persecutor was the government, he could not relocate. Thus, BIA was not "on notice as to the[se] specific issues so that the BIA ha[d] an opportunity to pass on [them]." *See Gonzalez-Castillo v. Garland*, 47 F.4th 971, 981 (9th Cir. 2022) (cleaned up).

under clear error review, "if it appears that the BIA gave more weight to certain facts in the record than to others, leading to a different conclusion from the IJ, our court may justifiably infer that the BIA applied the wrong standard of review").

To reiterate the proper standard of review: We review the IJ's factual findings for substantial evidence. *Kalulu v. Garland*, 94 F.4th 1095, 1099 (9th Cir. 2024). The substantial evidence standard of review is "deferential," *Parada v. Sessions*, 902 F.3d 901, 909 (9th Cir. 2018), and a "stricter" standard of review than "clearly erroneous," *see Dickinson v. Zurko*, 527 U.S. 150, 156 (1999). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rivera v. Mukasey*, 508 F.3d 1271, 1274 (9th Cir. 2007). "The BIA's determination that [Singh] was not eligible for asylum must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole' . . . and [that determination] can be reversed only if the evidence presented by [Singh] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). In other words, "[u]nder that extremely deferential standard of review, [we] may not independently weigh the evidence and reverse the agency unless the evidence compels a conclusion contrary to the BIA's." *Kalulu*, 94 F.4th at 1099 (internal quotation marks and citation omitted).

Our job is not "to scour the record in search of" evidence that is contrary (or "equivocal," Maj. Op. at 29) to the IJ's decision, *see Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996), rather "[o]ur standard of review, . . . does not enable us to substitute our judgment for the BIA's." *Dong v.*

*Garland*, 50 F.4th 1291, 1299 (9th Cir. 2022) (citation and alteration omitted). To the contrary, "[w]e are required to accept administrative findings of fact unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* at 1299–1300 (cleaned up).

Applying that standard, the facts established by the IJ are supported by substantial evidence. The IJ conducted an individualized analysis as to Singh's well-founded fear of persecution outside of Punjab.

My colleagues next argue that the government's preponderance-of-evidence standard effectively requires the government prove that *no official* (INC members or anyone else) would target Singh. Maj. Op. at 28. Such a standard is formulated "out of whole cloth" and seems impossible to meet. *See also* 8 C.F.R. § 1208.13(b)(3) (outlining factors to consider when considering relocation, such as "the size of the country of nationality or last habitual residence, the geographic locus of the alleged persecution, the size, numerosity, and reach of the alleged persecutor, and the applicant's demonstrated ability to relocate to the United States in order to apply for asylum"). This is not a case where the persecution was caused by the central government; rather, the source of the persecution was a political party. The government need only present evidence that Singh can relocate to avoid the "persons or entities that caused the past persecution." *See Kaur v. Wilkinson*, 986 F.3d 1216, 1231 (9th Cir. 2021). Here, the IJ considered all of the relevant circumstances and found that the government met its burden. The alleged persecutors were members of the INC party.[3]

---

[3] My colleagues also assert that the IJ limited its decision to "Punjabi officials." Maj. Op. at 28. This statement is not accurate. As outlined in

Thus, the government was only required to show by a preponderance of the evidence that Singh was able to relocate to avoid persecution by those members. Unlike *Singh v. Whitaker*, 94 F.3d at 661 or *Singh v. Garland*, 97 F.4th at 608–09, the IJ did not limit his analysis to Punjabi police rather the IJ recognized that Singh's persecutors were members of the Congress Party. The IJ did not suggest that Singh could relocate to locations where the Congress Party was in control, but rather limited Singh's ability to relocate outside of those areas. Thus, despite my colleagues assertions to the contrary, the IJ's findings that (1) violence against, or persecution of Mann Party members, Sikhs, or pro-Khalistan activists outside of Punjab is rare; (2) Singh was a low-level member of the Mann Party; and (3) the country reports demonstrate that only high-profile militants are targeted outside of Punjab shed light on whether Singh, as an advocate for the Mann Party, will be persecuted in a new state and support the government's burden that Singh can relocate to avoid persecution.

Moreover, the country reports support the IJ's findings. Notably, the record shows that (1) "country reports do not suggest that there exists a general risk in India of ill-treatment for members of the Shiromani Akali Dal (Amritsar/Mann) party"; (2) "members were not subject to ill-treatment unless the individual was suspected by police of terrorism, extremism or violent activities, and that outspoken members were not harassed or arrest for participating in party gatherings, publicly complaining about the treatment of Sikhs by authorities or calling for the creation of Khalistan"; (3) when "party members were

---

the IJ's findings of fact, the IJ referenced the Congress Party generally, not just Punjabi officials.

harassed or arrested" for taking part in such events, those persons were within the State of Punjab; and (4) there is no "general risk of ill-treatment for Sikhs who were returned to India solely on the basis of ideological support for the establishment of Khalistan" outside of Punjab. Because the record supports the IJ's conclusion that Singh could safely engage in Mann Party activities in areas outside of Punjab, the petition should be denied.

## 2. The IJ did not err in considering similar affidavits in making his adverse credibility determination.

One only has to read my colleagues' opinion and consider the order in which they address the issues, in order to tell which issue my colleagues desired to reach. (Of course, Singh's own arguments didn't help them with the relocation issue.) Instead, they should have applied the correct standard of review and denied the petition based on Singh's ability to relocate to avoid persecution. Such a decision would have precluded them from reaching this credibility issue.

Then, when addressing it, my colleagues cherry pick facts, manufacture arguments, and, again, ignore the standard of review. Lastly, they improperly substitute their decision for that of the IJ.

In fact, when reviewing a credibility issue, we must begin by applying our proper standard of review for credibility findings. We have consistently recognized that "the REAL ID Act requires a healthy measure of deference to agency credibility determinations," which "makes sense because IJs are in the best position to assess demeanor and other credibility cues that we cannot readily access on review." *Shrestha v. Holder*, 590 F.3d 1034, 1041 (9th Cir. 2010).

This credibility finding requires the IJ to "consider[] the totality of the circumstances, and all relevant factors." 8 U.S.C. § 1158(b)(1)(B)(iii). Relevant factors include but are not limited to:

> demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim . . . .

*Id.* Relevant factors also include "any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial." 8 C.F.R. § 1240.7(a).

An IJ's "factual findings 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Garcia v. Holder*, 749 F.3d 785, 789 (9th Cir. 2014) (quoting 8 U.S.C. § 1252(b)(4)(B)). My colleagues circumvent this standard of review by concluding that the IJ

misapplied *Matter of R–K–K–*, 26 I. & N. Dec. 658 (BIA 2015), in making his credibility determination.[4] In doing so, my colleagues make several errors.

## A. *The majority manufactures arguments for Singh.*

My colleagues expand Singh's arguments on appeal. In his opening brief, Singh argues that the IJ's "reliance on *Matter of R–K–K–* lacks the requisite commonsense approach to determining credibility, and mistakes innocent, probative similarities for evidence of falsehood." Singh's arguments are based upon the premise that "[t]he fact that other applicants have suffered similar abuses as Petitioner – without more significant similarities between his declaration and those others than are present here—should bolster his credibility, not undermine it." Singh's entire argument of error is that the facts of his case are not substantially similar to the other declarations.

Rather than limit their opinion to Singh's distinct issue, my colleagues expand Singh's argument and conclude that the IJ (1) erred in relying on "the government's unreliable demonstrative chart and declaration," (2) erred in not "discuss[ing] the significant differences between Singh's affidavit and the other declarations," and (3) created due

---

[4] The use of inter-proceeding documents is not limited to *R–K–K–* declarations. We have also allowed IJs to use these documents to assess whether an applicant has filed a frivolous asylum application. *See Ahir v. Mukasey*, 527 F.3d 912, 917 (9th Cir. 2008) (outlining the framework for an IJ to make a frivolous application finding); *see also Sliusar v. Lynch*, 608 F. App'x 529, 530 (9th Cir. 2015) (upholding the use of similar declarations to make a frivolous application finding).

process concerns.[5] Singh did not raise any of these arguments in his opening brief. Moreover, Singh did not raise these arguments before the BIA. Instead, Singh argued to the BIA that the IJ erred because (1) the similarities that the [IJ found] are not unique nor is there a presence of distinct language when all declarations are reviewed; (2) Singh's declaration contained evidence not present in other declarations; (3) there was no evidence that Singh knew any of the other applicants; and (4) an asylum officer found Singh credible. Thus, my colleagues manufactured arguments not raised by Singh, which should not have been addressed, let alone used as a basis for granting the petition. *See Greenwood*, 28 F.3d at 977 ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review.").

## B. *The majority interprets Matter of R–K–K– too narrowly.*

My colleagues interpret *Matter of R–K–K–* too narrowly. In doing so, my colleagues want to limit an IJ's ability to assess an applicant's credibility rather than just apply the correct standard of review. The reason: my colleagues want to limit *Matter of R–K–K–* to identical or plagiarized

---

[5] My colleagues assert that they did not manufacture these arguments, because Singh challenged the "misapplication" of *Matter of R–K–K–*. Maj. Op. at 22–24. However, no where do they cite to any language in Singh's brief that suggests that he raised these arguments. *See* Maj. Op. at 22–23. Thus, my colleagues' reliance on *Singh v. Garland* is misplaced, because in that case, the petitioner argued that the agency applied the wrong burden of proof, an error that could not be ignored. *See* 97 F.4th at 609. Here, Singh never argued that his due process rights were violated nor did he argue the government's methodology of producing inter-proceeding documents was flawed.

applications where the applications have similar language, grammar, and spelling errors. However, those limitations are not required under the relevant regulations or case law.

*Matter of R–K–K–* sets forth a three-part framework "to use when relying on inter-proceeding similarities as part of an adverse credibility determination." 26 I. & N. Dec. at 661. This framework requires the IJ to (1) "identify similarities between the documents or other evidence under consideration," (2) provide "notice [to the applicant] of the[se] similarities," and (3) provide "the applicant a reasonable opportunity to explain the similarities." *Id.* Although the case of *Matter of R–K–K–* included spelling and grammatical errors, nothing in the case itself suggests that IJs should be limited to such a narrow basis for assessing credibility. To be sure, "the presence of even a relatively few similarities could raise the same credibility concerns if, in the context of an overall asylum claim, . . . unique factual circumstances were repeated without reasonable explanation." *Id.* at 662; *see id.* at 661 (explaining that "some inter-proceeding similarities are so significant that, when left unexplained, they cannot be ignored").

My colleagues do not accept the IJ's findings of fact that there were unique factual similarities because of the identical sequence of events. Instead, my colleagues look to each individual event in isolation and assert they are non-unique events (i.e., "police refuse complaint"). Although the IJ did break the events down to identify 23 similar facts, the IJ's overall conclusion was that the inter-proceeding similarities were significant because those 23 facts occurred in the same order and that was not a mere coincidence. When, as here, an IJ is faced with multiple declarations setting forth identical sequences of events, it is still within his or her discretion to notify the applicant of these concerns and allow

the applicant to explain the similarities. Although there may be applicants with similar facts that form the basis of their persecution claim and all applicants seem to have some harm or threat of harm prior to entering the United States, it is more than a mere coincidence if the sequence of those events are identical.

To bolster their position, my colleagues argue that we have "granted asylum petitions by several Mann Party members who alleged very similar claims of persecution." Maj. Op. at 19 n.3. However, those cases demonstrate how an applicant may present similar facts but not an identical narrative to call into question an applicant's credibility. A close look at those cases reveals no identical sequence of events and demonstrates that my colleagues did not provide the proper deference to the IJ in this case.

First, in *Singh v. Garland*, 57 F.4th 643 (9th Cir. 2023), while there are similarities, there are not identical sequences of events. First, the petitioner's brother was attacked twice and fled to the United States. *Id.* at 649. Thereafter, the petitioner was confronted by members of the Congress Party demanding to know where his brother was. *Id.* The petitioner was physically attacked twice but the first attack was not after hanging posters but rather after praying at a Sikh temple, and he was not helped after the first attack by unknown people. *Id.* The second attack did not occur after a Mann Party event but rather after the petitioner was returning from his family farm. *Id.*

Second, in *Singh v. Whitaker*, 914 F.3d 654 (9th Cir. 2019), the petitioner received telephonic threats in three separate months. *Id.* at 657. The petitioner was arrested twice by the police. *Id.* After the first arrest, the police beat him with a leather strap and detained him for six days. *Id.* After

the second arrest, the police beat him with their fists and sticks and detained him for 10 days. *Id.*

Third, although *Singh v. Garland*, 97 F.4th 597 (9th Cir. 2024), is closer, the facts do not evidence the same sequence of events. The petitioner was attacked and beat him with hockey sticks and baseball bats; however, there is no mention that he was hanging posters or that unknown people stopped the attack. *Id.* at 600. The petitioner also spent one day in the hospital and remained on bed rest for 15 days. *Id.* The second attack occurred on his way home after prayer at a Sikh temple. *Id.* at 601. Further, the case does not suggest that the attack was interrupted by farmers, and the petitioner spent one day in the hospital. *See id.*

Finally, in *Kumar v. Garland*, 110 F.4th 1149 (9th Cir. Aug. 2, 2024), the petitioner was first threatened while handing posters. *Id.* at 1153. The attackers ripped his posters down and threatened him but when people came out of their homes, they ran away. *Id.* The petitioner was then attacked after returning from working at a camp. *Id.* He spent two days in the hospital. *Id.* at 1154. The petitioner initially went to the police by himself but after getting no results returned with his father. *Id.* At that time, the police threatened the petitioner. *Id.*

Thus, even though my colleagues assert that these cases reveal the same facts that Singh claims, none of the cases raise the 23 identical sequence of events that the IJ outlined. Accordingly, the record supports the IJ's skepticism of Singh's claims.

## C. *The majority do not apply the proper deference to the IJ's fact-finding.*

My colleagues take too narrow of view on the similarity of the facts that do exist, which similarities caused the IJ to question Singh's testimony. To demonstrate, I first outline the facts chronologically as provided by Singh:

1. Singh was introduced to Mann party by his father and uncle.

2. On April 13, 2016, Singh joined the Shiromani Akali Dal (Amritsar) ("Mann Party").

3. On August 20, 2017, Singh hung posters for a Mann Party blood donation camp.

4. Singh was approached by four members of the INC.

5. The four men confronted him about the posters.

6. The men told him to stop putting up posters, join the INC, and offered to give him money and illicit drugs to sell if he joined the INC.

7. Singh refused; the men tore his posters and pushed him on the ground; they hit him on his back, chest, shoulders, and legs with hockey sticks and baseball bats.

8. Six-seven people came to help him; these people helped get him to his family. The men stopped when witnesses intervened

9. The men threatened Singh with death before they left.

10. Singh went to police with father; police refused to take the report and threatened arrest.

11. Singh rested for 20-25 days and then went back to work for Mann Party.

12. On October 19, 2017, Singh was attacked by same four INC members after he returned from a religious meeting.

13. The men told Singh to leave the Mann Party.

14. The men pushed Singh to the ground, hit him on the back, stomach, legs and shoulders with hockey sticks and baseball bats; one held gun to his head.

15. Laborers in nearby field came to help.

16. The men threatened Singh with death before they left.

17. Thereafter, INC members looked for Singh at his home three to four times.

18. Singh was in hiding until he entered the United States.

19. INC members continue to look for Singh; threatening Singh with death if they see him.

The IJ concluded that there were "substantial similarities between the allegations in [Singh's] case and those in the twenty redacted declarations." The IJ pointed out the following substantial similarities:

1. All respondents were low-level workers of their political party.

2. All respondents were hanging posters for their political party's event (usually a blood donation camp).

3. When hanging posters, all respondents were approached by an opposing party (usually in a car).

4. All respondents all claim that the members of the opposing party asked the respondents what they were doing and demanded that the respondents leave the respondents' party.

5. In 19/20 cases, the opposing party attempts to have respondents join their party.

6. In 10/20 cases, the opposing party asks the respondents to sell drugs.

7. All respondents refused.

8. The opposing party members attacked or threatened all of the respondents.

9. In 18/20 cases, opposing party members slapped, punched or kicked the respondents during the first attack.

10. In 2/20 cases, opposing party members used wooden sticks or hockey sticks.

11. In 13/20 cases, opposing party members tore the posters.

12. All respondents were helped by nearby strangers, which caused the attackers to flee.

13. Before the opposing party members left, they threaten to harm all the respondents if they saw them again.

14. In 13/20 cases, the respondents went to a doctor after the first attack and received medical treatment for their injuries.

15. All respondents went to the police; 19 after first attack and 1 after second attack.

16. The police refused to file complaints for all respondents, because the opposing political party was in power and threatened to file a false report against the respondents and put them in jail if pursued matter.

17. All respondents were attacked a second time after they returned home from a political party event.

18. All respondent were approached by opposing party members (usually in a car).

19. In 17/20 cases, the respondents were beat with wooden sticks, hockey sticks, or baseball bats.

20. All respondents were helped by strangers (usually farmers or laborers in a field) who witnessed the attack, which caused the attackers to flee.

21. Before the opposing party members left, they threatened to kill all the respondents.

22. In 19/20 cases, the respondents received medical treatment from a doctor and then fled India (usually with assistance from family).

23. All cases involved exactly two attacks.

Despite these striking similarities, my colleagues conclude that "the IJ did not rely on any similarities in language, grammar, or narrative structure between Singh's affidavit and any of the twenty redacted declarations submitted by the government below." Maj. Op. at 16. This conclusion is not the correct standard. Neither *Matter of R–K–K–* nor *Mei Chai Ye v. U.S. Dep't of Just.*, 489 F.3d 517 (2d Cir. 2007),

require the declarations be identical. Rather, IJs are allowed to look at "striking similarities between affidavits," which may "indicat[e] that the statements are 'canned.'" *Mei Chai Ye*, 489 F.3d at 524. Recognizing the possibilities that there are legitimate circumstances wherein affidavits might be substantially similar, the Second Circuit emphasized that these findings should be viewed with "an especially cautious eye." *Id.* at 520. Nevertheless, the Second Circuit concluded that, because the IJ followed procedural safeguards, the "similarities were appropriately treated as substantial evidence of incredibility." *Id.* at 527.

In this case, the IJ understood his duties in assessing the inter-proceeding similarities and provided all of the safeguards outlined in *Matter of R–K–K–*. The IJ specifically "acknowledge[d] that individuals who are members of the same political party may experience similar events, and that similarities in applications may naturally occur when multiple-individuals flee from similar conditions in the same region." Yet, the IJ concluded that in this case, "the *R-K-K-* declarations are not merely similar, they contain slight variations on essentially identical events occurring in essentially identical order and recounted in essentially identical manners. Thus, the numerous resemblances are specific, and go beyond-what could reasonably be deemed a 'mere coincidence.'"

My colleagues refer to these significant coincidences as "broad factual similarities," and argue that *Matter of R–K–K–* is limited to "striking similarities in the language, grammar and structure of related affidavits." Maj. Op. at 16. However, such a limitation is not present in *Matter of R–K–K–*. My colleagues' desire to require identical language or evidence of plagiarism before an IJ can question an applicant's credibility is just their basis for substituting their

judgment of the applicant's credibility for that of the IJ. Although the facts outlined in the other declarations are not perfectly analogous, the vast majority of the declarations repeat the "unique factual circumstances . . . without reasonable explanation." *Matter of R–K–K–*, 26 I. & N. Dec at 662; *see id.* at 665 (noting that "[b]oth declarations use the same distinctive descriptions of the alleged events, using an almost identical narrative"). Here, all of the respondents experienced the same sequence of events before coming to the United States: exactly 2 attacks, the facts surrounding the attacks occurred in the same order (the first after hanging posters and the second after returning from a rally of some sort), and after both attacks nearby strangers came to their aid. These facts constitute substantial evidence to support the IJ's conclusion that the similarities between Singh's affidavit and the other declarations were significant and more than mere coincidences.

My colleagues lastly assert in a footnote that it need not address the IJ's findings that Singh was non-responsive and evasive regarding his entry to the United States, and that corroborating evidence did not overcome the adverse credibility concerns. Maj. Op. at 22 n.4. I agree these findings need not be addressed. Singh, himself, did not challenge these findings in his opening brief.

Because it is the IJ (not us) who is charged with determining whether an applicant for asylum is credible and worthy of the relief sought, we should not interfere with the IJ's use of relevant evidence to make his or her determination as long as the IJ follows all of the statutory and case related safeguards to make his adverse credibility determination. This record does not compel us to find differently.

**D.** *The majority unilaterally introduce new requirements for inter-proceeding comparisons.*

My colleagues further limit the IJ's ability to make credibility findings using inter-proceeding similarities by adding new requirements for submission of R–K–K– declarations.[6] Without explanation or authority, they want the government to disclose how they selected the documents. Maj. Op. at 18. Even if the government reviewed 100 declarations and only 20 declarations recounted the identical sequence of events, an IJ should still be able to consider whether those 20 declarations call into question the applicant's testimony. They also want IJs to provide their methodology of how they determined that the events were essentially identical, occurred in identical order, and were recounted in essentially identical manners. There is no authority for these additional requirements beyond my colleagues desire to make credibility decisions themselves.

In doing so, my colleagues ignore the fact that IJs "are creatures of statute, receiving some of their powers and duties directly from Congress, 8 U.S.C. § 1252(b), and some of them by subdelegation from the Attorney General, 8

---

[6] My colleagues assert that they are not creating new requirements outside of *Matter of R–K–K–*, but rather are "merely illustrat[ing] the problems that arise when the IJ relies on non-unique declarations of unknown provenance to make questionable 'similarity' findings that are not grounded in 'remarkably similar' language or grammar." Maj. Op. at 18 n.2. This assertion is belied by the opinion's own words. As explained, *Matter of R–K–K–* outlines the procedure safeguards required when using inter-proceeding documents. Those requirements do not include requiring the government to provide its methodology of how it selected substantially similar declarations. Rather, the government need only comply with 8 C.F.R. § 1208.6(a) before disclosing these documents. Here, there is no evidence (or argument) that the government did not fulfill its duties.

U.S.C. § 1103." *Lopez-Telles v. INS*, 564 F.2d 1302, 1303 (9th Cir. 1977). Relevant here, are the statutes and regulations requiring the IJ to make findings of fact, including credibility findings, before granting relief from removal. *See* 8 U.S.C. § 1158(b)(1)(B)(iii). These statutes and regulations allow IJs to "receive in evidence *any oral or written statement* that is material and relevant to any issue in the case . . . *made by . . . any other person* during *any* investigation, examination, hearing, or trial." 8 C.F.R. § 1240.7(a) (emphasis added). The "sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair." *Espinoza v. INS*, 45 F.3d 308, 310 (9th Cir. 1995).

Despite this broad authority, my colleagues today decide that they are in a better position to make an adverse credibility determination of an applicant than the IJ who heard and observed the applicant. In doing so, they preclude future IJs from using similarly structured claims to question an applicant's credibility. Such a conclusion is contrary to Congress's mandate that an IJ can consider "*all* relevant factors." 8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added).

We must keep in mind that IJs are tasked with very difficult jobs of assessing credibility of asylum applicants entering the United States, "at least some of whom are undoubtedly giving false testimony supplied to them by the smugglers who arranged for their unlawful entry." *Xiulian Li v. Holder*, 480 F. App'x 71, 75 (2d Cir. 2012). Congress has provided IJs significant leeway and deference to make these determination, and as long as the proper procedures are followed, we should not interfere with the process. *See Lin v. Gonzales*, 434 F.3d 1158, 1164 (9th Cir. 2006) (recognizing that "judicial experience combined with

obvious warning signs of forgery, when articulated on the record, may satisfy the substantial evidence requirement").

As I explained above, the petition should be denied based solely on Singh's ability to safely relocate in India. We should not have reached the credibility issue as my colleagues have insisted. Nevertheless, because Singh did not argue (and there is no evidence) that his due process rights were violated, we should follow the substantial evidence standard of review for findings of fact and not create new obstacles for IJs to do their job.