**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GURPARAS SINGH, | No.23-1247 |
| *Petitioner*, | Agency No. A216-276-598 |
| v. | |
| PAMELA BONDI[*], Attorney General, | OPINION |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted August 22, 2024
San Francisco, California

Filed March 17, 2025

Before: Daniel A. Bress and Lawrence VanDyke, Circuit
Judges, and Robert S. Lasnik, District Judge.[**]

---

[*] Pamela Bondi is substituted for her predecessor, Merrick Garland, as Attorney General, pursuant to Federal Rule of Appellate Procedure 43(c).

[**] The Honorable Robert S. Lasnik, Senior United States District Judge for the U.S. District Court for the Western District of Washington, sitting by designation.

Opinion by Judge VanDyke;
Concurrence by Judge Bress

**SUMMARY**[***]

### Immigration

The panel denied Gurparas Singh's petition for review of the Board of Immigration Appeals' decision affirming the denial of asylum and related relief and protection, concluding that substantial evidence supported the BIA's determination that Singh lacked credibility because his claim exhibited significant linguistic and factual similarities to other claims filed in the past by other asylum applicants from India, and none of the remaining evidence in the record compelled the conclusion that the BIA erred in denying relief and protection.

Distinguishing *Singh v. Garland*, 118 F.4th 1150 (9th Cir. 2024), which held that the BIA misapplied *Matter of R-K-K-*, 26 I. & N. Dec. 658 (B.I.A. 2015), by relying exclusively on broad factual similarities between declarations in making an adverse credibility determination, the panel explained that in this case the agency relied on identical language across Singh's declaration and the declarations from other asylum applicants. Specifically, the IJ identified word for word repetition, repeated and implausible similarities in narrative structure, and unique, detailed factual similarities between declarations. The

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

credibility determination was procedurally proper where the IJ gave Singh meaningful notice of and a reasonable opportunity to explain the similarities and properly considered the totality of the circumstances in finding him not credible. Likewise, the agency properly followed procedural safeguards and appropriately concluded that Singh knowingly filed a frivolous asylum application.

Once Singh's own testimony was disregarded, there was not enough individualized evidence to compel the conclusion that there was a greater than fifty-percent chance that Singh himself would be tortured upon removal to India.

Concurring, Judge Bress, with whom Judges VanDyke and Lasnik joined, wrote separately to express his view that the decision in *Singh v. Garland* was wrong and requires re-examination. By effectively insisting upon the specific use of identical language across affidavits, *Singh v. Garland* unduly cabined the circumstances in which IJs are permitted to recognize that a petitioner's account is not credible, even when the account distinctively tracks the nearly identical accounts of other petitioners from the same region. Judge Bress wrote that copy-and-pasted language from another affidavit is surely one indicator that a petitioner is not credible, but it can hardly be considered a requirement. Judge Bress agreed with Judge N.R. Smith's compelling dissent in *Singh v. Garland* that IJs should not be limited to such a narrow basis for assessing credibility.

## COUNSEL

Manpreet S. Gahra (argued), Law Offices of Gahra & Goswami, Pleasanton, California, for Petitioner.

Roberta O. Roberts (argued), Trial Attorney, Office of Immigration Litigation, Civil Division; Michael C. Heyse, Senior Litigation Counsel, Office of Immigration Litigation; Jonathan A. Robbins, Assistant Director, Office of Immigration Litigation; Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division; United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

VANDYKE, Circuit Judge:

This case arises from Gurparas Singh's ("Singh") petition for review of a Board of Immigration Appeals ("BIA" or "Board") decision dismissing his appeal of an order that denied his applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). We have jurisdiction under 8 U.S.C. § 1252.

Substantial evidence supports the BIA's conclusion that Singh lacked credibility because his claim exhibited significant linguistic and factual similarities to other claims filed in the past by other asylum applicants from India. And once Singh's own testimony is disregarded, none of the remaining evidence in the record compels the conclusion that the BIA erred in denying asylum and withholding of removal. Substantial evidence likewise supports the BIA's

denial of Singh's CAT claim. We therefore deny the petition.

## I. BACKGROUND[1]

Gurparas Singh is a native and citizen of India who claims membership in India's Mann political party—an opposition party that advocates for the rights of Sikhs and for Sikh statehood. Singh states that he was threatened and attacked on several occasions by members of the ruling BJP party because of his efforts on behalf of the Mann party. This alleged persecution is the basis for his asylum, withholding of removal, and CAT claims.

Before the agency, Singh recounted two specific instances of alleged persecution by BJP members in support of his application. The facts alleged in these encounters are quite specific, and they are recounted with particular phrasing. The first incident allegedly occurred in July 2017. Singh states that he was "placing posters in a neighboring village" when five people in a car marked with the BJP logo pulled up next to him, cursed at him, and asked him to switch parties and start selling drugs for them. When Singh "did not stop working for [his] party," the BJP members threatened to kill him if he did not cease engaging in Mann party activities.

The second incident allegedly occurred in December 2017 when Singh was returning home on a motorcycle from a blood drive organized by the Mann Party. Again, a car marked with a BJP logo stopped him. Four men got out of

---

[1] Some facts discussed herein are based on testimony the immigration judge ("IJ") found not to be credible. We present them here as background and to demonstrate why the IJ found Singh's testimony noncredible.

the car, attacked him with wooden sticks, and indicated they intended to kill him because of his continued engagement with the Mann Party.  Singh was rescued from the attack by nearby farmers and a village doctor treated his injuries. After the incident, he went to the police to file a complaint, although the police refused to file a report because the attackers belonged "to the current government."  When Singh insisted on filing a complaint, the police threatened to jail him for making a false report.  Because the police refused to help him, his father believed that it would be safer if he moved to the United States.

Singh entered the United States without a valid entry document on April 15, 2018.  After finding that he had demonstrated a credible fear of persecution or torture, the Department of Homeland Security ("DHS") served him with a notice to appear on May 10, 2018.  He was charged with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) as a noncitizen present in the United States while not in possession of a valid entry document or travel document. Singh admitted the factual allegations and conceded removability.  He then applied for asylum, withholding of removal, and CAT protection.

Before Singh testified at his hearing, the IJ explicitly informed him that "[i]f you knowingly file a frivolous application for asylum, you could be forever prevented from ever receiving any benefits under immigration laws for the rest of your life."  The IJ asked if Singh understood, to which Singh replied "[y]es, sir."  Singh also affirmed that his application was "true, complete, and correct."  Thereafter, Singh testified about the two incidents involving BJP Party members.

After cross-examining Singh, DHS presented a rebuttal exhibit consisting of six redacted declarations (and later a seventh declaration) from other asylum applicants that were strikingly similar factually (and, in places, linguistically) to Singh's declaration. The DHS exhibit pointed to no fewer than nine parallels in the narrative structure between each of these other declarations and Singh's declaration: there were (1) two confrontations involving, (2) opposing party members, (3) driving vehicles with BJP logos on them, (4) an attack by four individuals, (5) involving sticks, (6) a rescue by strangers, (7) that are usually farmers, (8) the refusal of police to take a report, and (9) the threat of arrest. The first incident occurs when the petitioner is putting up posters, and the second occurs when the petitioner is on his way home from a party-sponsored community event. In addition to the "identical narratives" displayed in Singh's declaration and the six comparative declarations, DHS also noted that Singh's declaration and another seventh declaration "contain a multitude of identical wording." This seventh declaration with extensive identical wording was prepared in another case in which Singh's same lawyer represented the other applicant.

Considering the numerous similarities in facts and narrative structure, the IJ gave Singh time to review the materials presented by DHS and set another hearing date. At that follow-up hearing, counsel for Singh argued that the similarities existed because they reflect how the BJP and the police generally operate in India. DHS countered that this did not explain why significant portions of these claims recounted the same "specific details and facts" and "verbatim" matched declarations in other cases.

Given the narrative and linguistic similarities, the IJ found that Singh was not credible. The IJ explained that

"there are numerous repeated evidentiary points raised by respondent that match (sometimes word for word) aspects of other claims in other cases." Indeed, the parallels were so numerous that the IJ noted "if these claims were fingerprints, they would match," and thus the IJ concluded Singh's declaration was a "'canned' claim." From this, the IJ also concluded that the claim "was knowingly submitted, rehearsed, and fabricated for the purposes of attaining asylum under false pretenses," and that Singh had therefore knowingly filed a frivolous asylum claim. Finally, the IJ found that the other generalized evidence presented by Singh and not affected by the adverse credibility finding merely established that there is "strife in India," but not that it is more likely than not that Singh himself would be tortured by or with the acquiescence of the Indian government upon his return. Accordingly, the IJ also denied Singh's claim for CAT protection.

Upon appeal to the BIA, the Board determined that the IJ did not clearly err in making its adverse credibility determination. The BIA explained that the IJ "considered the wording used by [Singh] as compared to the redacted affidavits filed in other cases," noted that "the language was verbatim at times," and highlighted the "multiple distinct components that matched the other affidavits." Having established that Singh was not credible, and agreeing with the IJ that the remaining evidence in the record was insufficient, the Board upheld the IJ's denial of asylum and withholding of removal. The BIA also upheld the IJ's finding that Singh had knowingly filed a frivolous application. It concluded that the IJ had followed the procedural safeguards for a finding of frivolousness and that the finding was supported by the numerous linguistic and narrative similarities between Singh's declaration and the

other previous affidavits.  Finally, the BIA likewise upheld the denial of CAT relief.

## II. STANDARD OF REVIEW

"Where, as here, the BIA reviewed the IJ's credibility-based decision for clear error and 'relied upon the IJ's opinion as a statement of reasons' but 'did not merely provide a boilerplate opinion,' we look to the IJ's oral decision as a guide to what lay behind the BIA's conclusion." *Dong v. Garland*, 50 F.4th 1291, 1296 (9th Cir. 2022) (citing cases) (internal quotation marks omitted).  In such cases, this court reviews the grounds and reasoning in both decisions.  *See De Leon v. Garland*, 51 F.4th 992, 999 (9th Cir. 2022).

The agency's factual findings are reviewed for substantial evidence.  Under that extremely deferential standard of review, this court may not reverse the agency unless "the evidence compels a conclusion contrary to the BIA's." *Umana-Escobar v. Garland*, 69 F.4th 544, 550 (9th Cir. 2023).  Indeed, we must accept agency factual findings "as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Antonio v. Garland*, 58 F.4th 1067, 1073 (9th Cir. 2023) (cleaned up); *see also* 8 U.S.C. § 1252(b)(4)(B).  A "determination that an applicant knowingly made a frivolous application for asylum is reviewed de novo for compliance with the procedural framework outlined by the BIA" in *Matter of Y-L-*, 24 I. & N. Dec. 151 (B.I.A. 2007). *Kulakchyan v. Holder*, 730 F.3d 993, 995 & n.1 (9th Cir. 2013) (alterations omitted).

"Under the REAL ID Act, an applicant for relief is not presumed credible, and the IJ is authorized to base an adverse credibility determination on the totality of the circumstances and all relevant factors." *Iman v. Barr*, 972

F.3d 1058, 1064 (9th Cir. 2020) (internal quotation marks omitted). If the agency deems an applicant's testimony to be not credible under the totality of the circumstances, the applicant will usually be unable to meet his burden for asylum, withholding of removal, and CAT protection because any remaining evidence in the record is often insufficient. *See, e.g.*, *Rodriguez-Ramirez v. Garland*, 11 F.4th 1091, 1094 (9th Cir. 2021) (per curiam); *Shrestha v. Holder*, 590 F.3d 1034, 1048 (9th Cir. 2010).

## III. DISCUSSION

Substantial evidence supports the BIA's decision in this case. The many linguistic and narrative similarities between Singh's declaration and the comparative declarations presented by DHS sufficiently support the agency's conclusion that Singh fabricated his story about what happened to him in India. And once Singh's own testimony is permissibly disregarded as noncredible, nothing in the record compels the conclusion that the agency erred in denying his asylum and withholding claims. There is likewise substantial evidence supporting the BIA's denial of CAT protection. Again, once Singh's own testimony is set aside, nothing in the record compels the conclusion that it is more likely than not that he would be tortured if removed to India. And finally, the BIA did not err in concluding that Singh filed a frivolous application.

### a. Our Recent Decision in *Singh v. Garland*, 118 F.4th 1150 (9th Cir. 2024)

After argument in this case, this court decided *Singh v. Garland*, 118 F.4th 1150 (9th Cir. 2024), which considered the issue of allegedly canned claims in a case involving a Mann Party member.

In *Singh*, petitioner Jasswinder Singh, a member of the Mann Party in India, was hanging up posters for his party when four members of an opposition political party—the Indian National Congress Party (INC) in his case—approached him and demanded that he join their party and sell drugs. 118 F.4th at 1156–57. Singh refused, and the four men beat him with wooden sticks, hockey sticks, and baseball bats. *Id.* at 1157. The INC members stopped beating him when a group of six or seven witnesses intervened, and the INC members threatened to kill him the next time they saw him. *Id.* Singh went to the police to report the incident, but the police refused to file a complaint because the INC party was in control of the government. *Id.* The police also told Singh that he would be arrested if he came back to the police. *Id.* Two months later, Singh was again attacked by four INC members while returning from a religious meeting. *Id.* Laborers in a nearby field came to Singh's rescue, and one of the attackers again threatened Singh with death. *Id.*

At the end of Singh's hearing before the IJ, the IJ explained that he was "concerned about this case because it seems to mirror many cases coming from the same region that I have encountered, and … I have some credibility concerns on that basis." *Id.* Therefore, the IJ requested supplemental briefing from the parties concerning *Matter of R-K-K-*, 26 I. & N. Dec. 658 (B.I.A. 2015), "which permits immigration judges to consider strikingly similar affidavits submitted by asylum applicants in unrelated proceedings as a basis for an adverse credibility determination." *Singh*, 118 F.4th at 1156–57.

Along with its supplemental brief, the government submitted twenty declarations from other past asylum applicants from India who alleged political persecution by

opposing political parties. *Id.* at 1157. The IJ ultimately concluded that Singh was "not credible based on 'similarities between [his] testimony and that of respondents in other removal proceedings.'" *Id.* at 1158. The BIA affirmed the IJ's adverse credibility determination and rejected Singh's argument that the factual similarities were "actually generalized and not unique factual circumstances." *Id.* The BIA therefore dismissed Singh's appeal. *Id.*

The panel in *Singh*, 118 F.4th 1150, disagreed and granted the petition, "conclud[ing] that the agency misapplied *Matter of R-K-K-*" because "the IJ did not rely on any similarities in language, grammar, or narrative structure between Singh's affidavit and any of the twenty redacted declarations submitted by the government below." *Id.* at 1161. The majority held that "by focusing exclusively on broad factual similarities between the declarations, the IJ erred in applying *Matter of R-K-K-* too expansively." *Id.* at 1162. Unlike in this case, in *Singh*, 118 F.4th 1150, "the government concede[d]" that "Singh's affidavit substantially differs in its use of language, wording, and structure to describe the events in question." *Id.* at 1161. Therefore, the panel in *Singh* remanded to the agency to comply with this reading of *Matter of R-K-K-*. *Id.* at 1165.

### b. The Agency's Adverse Credibility Determination Was Supported by Substantial Evidence.

Applying *Singh*, 118 F.4th 1150, we conclude that substantial evidence  supports the agency's adverse credibility determination. In making its adverse credibility determination, the agency relied on identical language across Singh's declaration and the declarations from other asylum applicants presented by DHS. The agency also noted nine

key narrative similarities between Singh's declaration and testimony and the other declarations. The agency thus found Singh to be noncredible because "there are numerous repeated evidentiary points raised by respondent that match (sometimes word for word) aspects of other claims in other cases." *Singh* recognized that when a declaration duplicates minute, unnecessary details from other similar declarations, that can be regarded as evidence of a canned claim. *See, e.g.*, 118 F.4th at 1156, 1158, 1162.

As a threshold matter, it remains appropriate for the agency—in the context of making an adverse credibility finding—to consider substantial and inadequately explained similarities between an applicant's testimony and that of other applicants. *See Matter of R-K-K-*, 26 I. & N. Dec. at 685 ("Significant similarities between statements submitted by applicants in different proceedings can be considered by an Immigration Judge in making an adverse credibility determination."). This court in *Singh*, 118 F.4th 1150, held only that it was error to "focus[] *exclusively* on broad factual similarities between the declarations" and "[t]hat multiple asylum applicants from the same region of India might describe similar forms of persecution does not necessarily imply their accounts are false and should be discredited." *Id.* at 1162 (emphasis added); *see also id.* at 1156 ("The agency misapplied *Matter of R-K-K-* by relying *solely* on non-unique factual similarities between Singh and other unknown declarants from India to make an adverse credibility finding." (emphasis added)).

The agency here did not find that Singh's account should be discredited merely because his claim shared similar, non-unique factual details with other claims. *Cf. id.* at 1162. Indeed, the IJ's analysis tracks the path laid out in *Singh*, 118 F.4th 1150. The IJ cited (1) "word for word" repetition in

the declarations, *see id.* at 1161 (noting that "identical phrases or words" is a "telltale sign[] of a canned or plagiarized affidavit"), (2) repeated similarities in narrative structure, *see id.* (faulting the IJ for not relying on similarities in "narrative structure"), and (3) unique, detailed factual similarities, *see id.* at 1156 (faulting the IJ for relying "solely" on "non-unique" factual similarities). Nor did the IJ assume that the similarities were just a result of each of the applicants hailing from the same region of India. Rather, the IJ went out of his way to explain that over 23 years he had seen several types of similar claims from applicants from the same countries, recognizing that it is common for people from the same region to have similar claims. But in this case, as the IJ determined, "the points of concordance are just too numerous and in some cases too minute to look past."

First, and critically, whereas *Singh*, 118 F.4th 1150, faulted an IJ for "not rely[ing] on any similarities in language," *id.* at 1161, the IJ in this case explicitly found that Singh's declaration and other declarations used the same language, "sometimes word for word."[2] Indeed, *Singh*, 118 F.4th 1150, emphasized that *Matter of R-K-K-* "instructs that [one] telltale sign[] of a canned or plagiarized affidavit [is] the way[] in which events are described in the affidavit, such as the use of identical phrases or words [or] the use of distinctive language." *Id*. That is present here. Indeed, Singh's declaration contains multiple copy-and-pasted

---

[2] *Singh*, 118 F.4th 1150, also relies on the fact that, in that case, the government had conceded that the petitioner's "affidavit *substantially* differs in its use of language, wording, and structure to describe the events in question." *Id.* at 1161 (emphasis added). Of course, the government does not make the same concession in this case.

sentences identical to those in the declaration of another applicant represented by Singh's attorney.

For example, both declarations state verbatim at the beginning of the third paragraph, "After joining my party as a worker, I was actively working and attended various programs of Shiromani Akali Dal Amritsar. My party appointed me various tasks that I have done …" Both declarations state that such various tasks included "putting up posters for my party and other work assigned by my party" and that the first altercation commenced when "I was placing posters in a neighboring village." Both declarations state word-for-word that after the second attack, "I received treatment from my village doctor for my injuries." The alignment continues into how they describe their fear of returning to India. Just compare Singh's description, "If I went back to India, the goons of the BJP party will kill me. It is not possible for me to move to any other part as BJP could track me anywhere in India," with the other applicant's description, "If I went back to India, the goons of the [redacted] party will kill me. It is not possible for me to move to any other party as [redacted] could track me anywhere in India."

As another example, Singh's declaration and Declaration #6 have multiple phrases in common (in the context of an overall substantially identical narrative, as discussed below). Singh's description of his first altercation with BJP members begins with him describing: "I was placing posters in a neighboring village." Declaration #6 similarly describes the start of the applicant's first altercation with BJP members: "I was placing posters in neighboring villages." Both declarations state that the BJP members offered them the opportunity to "make money by selling drugs" and that "I refused their offer." Both declarations explain verbatim that

after the first altercation, "I did not stop working for my party." And just as in *Matter of R-K-K-* itself, the "'nearly identical wording' in the [declarations] properly raised credibility concerns and the textual and narrative similarities [are] 'too numerous and obvious to be coincidental.'" *Id.* at 1160 (quoting *Matter of R-K-K-* 26 I. & N. Dec. at 661).

Second, as *Singh*, 118 F.4th 1150, recognized, *Matter of R-K-K-* teaches that one "telltale sign[] of a canned or plagiarized affidavit" is "the unnecessary addition of extraneous detail." *Id*. This too is present in this case. For example, consider that in Singh's declaration and in those declarations the government provided from other cases, the first encounter with opposing party members always occurs when petitioners are "putting up" or "placing posters" in a "nearby" or "neighboring" village. Petitioners are never engaging in any other activity when opposing party members confront them, and peculiarly, petitioners are always hanging up posters in a "nearby" or "neighboring" village, not their own village. It is true that the panel in *Singh* characterized "hanging posters" as a "broad factual similarity" that did not support an adverse credibility finding, 118 F.4th at 1163. But given that in this case the language describing how petitioners were "hanging posters" was either identical or nearly identical across the various declarations in the record, a point *Singh*, 118 F.4th 1150, did not address, the IJ here could regard Singh's account of putting up posters in a neighboring village as not credible, and as support for a broader adverse credibility determination.

As another example, consider that some of the similarities (such as the farmers or strangers who appear and save the applicants in each of the declarations) are not about the modus operandi of the alleged persecutor or about the

persecution itself, which might indicate a common pattern or practice of persecution. Rather, providing the occupation of nearby Good Samaritans is a distinct detail that was unnecessary to include, but is present in the majority of declarations (and the occupation is the same in these declarations: farmers or "men working in the fields nearby").

That these details are not necessary to an account of persecution is important because *Matter of R-K-K-* instructed (and *Singh*, 118 F.4th 1150, acknowledged, *id.* at 1161) that "remarkably similar language" gives rise to "credibility questions" *especially* "where there is additional material in both statements that 'wouldn't necessarily have to be mentioned but was mentioned.'" *Matter of R-K-K-* 26 I. & N. Dec. at 661–62 (brackets omitted) (quoting *Mei Chai Ye v. U.S. Dep't of Justice*, 489 F.3d 517, 521 (2nd Cir. 2007)). Indeed, "the presence of even a relatively few similarities [can] raise the same credibility concerns if … distinct language was used or unique factual circumstances were repeated without reasonable explanation." *Id.* (citing *Dehonzai v. Holder*, 650 F.3d 1, 8 (1st Cir. 2011)). And such minute, detailed similarities as the specific occupation of the Good Samaritans who (always) come to the rescue are patently not "broad" factual similarities likely to be "present in countless asylum applications." *Singh*, 118 F.4th at 1163.

Third, the agency properly "relied upon numerous repeated evidentiary points and details that were implausibly similar" across Singh's declaration and the other declarations. Although some of these similarities in narrative structure were also at issue in *Singh*, 118 F.4th 1150, the IJ in this case was permitted to view them in light of the evident plagiarism of specific language. As noted above, in *Singh*, the government conceded that "Singh's affidavit substantially differs in its use of language, wording,

and structure to describe the events in question." *Id.* at 1161. Because this case involves the critical missing piece from *Singh*—the verbatim borrowing of identical or nearly identical language from other declarations—it was permissible for the IJ to regard the factual similarities in a different light than the IJ in *Singh*. *See id.* at 1162 ("As required by *Matter of R-K-K-*, the IJ did not identify *any* linguistic or grammatical similarities between Singh's declaration and the RKK Declarations that would suggest Singh's affidavit had been plagiarized." (emphasis added)).

In light of the plagiarized language discussed above, the agency did not "focus[] exclusively on broad factual similarities between the declarations," but rather recognized the profound similarities in "narrative structure" in conjunction with the plagiarized language. *Id.* at 1162. Indeed, as the IJ recounted, the narrative arcs are so similar they could practically be transplanted from one declaration to another. "As if cooking up a claim from a recipe book," the IJ observed, the facts in each declaration are not merely recited from one declaration to the next; they are woven into the same narrative structure time and again.

As the government explained, "[e]ach description of persecution begins the same way: the respondent is putting up posters." Shortly after, a BJP vehicle appears and the occupants attempt to recruit the respondent. As soon as the respondent refuses, the occupants attack or threaten violence. "The second incident always occurs when the respondent is travelling home from a party function." "The respondent is then always rescued by strangers, in most cases farmers, … whose appearance causes the BJP" members to retreat. And finally, "[i]n all cases the police refuse to take a police report because the BJP is the government, and respondents are threatened with arrest." And in this case,

unlike in *Singh*, 118 F.4th 1150, we have verbatim language copied across declarations.

Consistent with *Singh*, 118 F.4th 1150, we stress these points not "exclusively" because of the substantial similarity between the facts of Singh's declaration and the facts of the other declarations the government has put forth. *See id.* at 1161–62. Rather, the point is how these facts, regardless of their relevance as constituent items in the set of facts, are tied together with verbatim language and woven together to create the same "narrative structure." *Singh*, 118 F.4th at 1161; *see also, e.g.*, *Narrative*, Webster's New World Dictionary (2nd ed.) (defining "narrative" as "the art or practice of telling stories;" also defining "structure" as "the arrangement or interrelation of all the parts of a whole").

We therefore understand the repeated references in *Singh*, 118 F.4th 1150, to the probative value of similarities in "narrative structure," *see id.* at 1159, 1161, as counseling the approach that we take here. Similar facts, looked at atomistically, ought not be the "exclusive" grounds for the agency to infer that a declaration is fabricated. *See id.* at 1161, 1162, 1164. But similarities in the narrative structure—similarities in "the arrangement or interrelation of all the [facts]," *Narrative*, Webster's New World Dictionary (2nd ed.)—are reasonable grounds upon which to draw an adverse credibility inference, especially in view of the verbatim language we have here.[3] *See Singh*, 118 F.4th at 1161; *Matter of R-K-K-*, 26 I. & N. Dec. at 665.

---

[3] The leading legal dictionary likewise supports this understanding. *See Narrative*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "narrative" as "an account of or description of a selected set of events,

* * *

The upshot is that the linguistic, narrative, and factual similarities between Singh's declaration and the declarations presented by DHS go beyond mere coincidence and cannot be explained away by the fact that these petitioners lived in similar situations in India. At a minimum, the IJ could so reasonably conclude. The narratives are nearly identical and, in some instances, are delivered with word-for-word repetition. The agency clearly did not "bas[e] its adverse credibility finding *exclusively* on non-distinct factual similarities." *Singh*, 118 F.4th at 1164 (emphasis added). Accordingly, the totality of the circumstances provides no reason to disturb the IJ's determination that Singh fabricated his story by simply copying the same story (and the same language) that so many other applicants had previously presented to the agency.

### c. The Agency's Adverse Credibility Determination Was Procedurally Proper.

Of course, the discretion to make adverse credibility determinations based on potentially fabricated declarations is not unbounded. It is cabined by important procedural safeguards to ensure that the testimony of applicants who merely happen to have been in similar situations is not automatically discounted. The BIA has identified three important procedural safeguards that the IJ must follow when making such a determination. First, the IJ must give the applicant "meaningful notice of the similarities that are considered to be significant." *Matter of R-K-K-*, 26 I. & N.

---

facts, experiences, or the like; a story"); *Structure*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "structure" as "the organization of elements or parts").

Dec. at 661. Second, the IJ must give the applicant a reasonable opportunity to explain those similarities. *Id.* Third, the IJ must consider the totality of the circumstances in making the credibility determination. *Id.* And all three of these requirements must be done on the record so there can be adequate review by the BIA. *Id.*

In making the adverse credibility determination in this case, the IJ properly followed these procedural safeguards. First, the IJ gave clear notice to Singh of the similarities that concerned him. The IJ specifically pointed out that the testimonies involved a variety of narrative similarities including, but not limited to, the "same number of attacks" and "vehicles bearing logos." The IJ also made Singh aware that the "verbatim" language copied across the declarations was cause for concern. When Singh's counsel responded that some of those similarities could be explained by the fact that they came from another client of his, the IJ pointed out that several of the affidavits with similarities come "from people who [you] don't represent." And this was all after the IJ had provided the rebuttal exhibit to petitioner and allowed him to review it. Singh clearly did not lack notice of the similarities that were the cause of the IJ's concern.

Second, Singh was allowed a reasonable opportunity to explain away those similarities. After DHS presented the rebuttal exhibit, the IJ stayed proceedings for nearly three weeks to give Singh and his counsel sufficient time to review the documents. At the follow-up hearing, the IJ explicitly asked Singh's counsel multiple times about the claim that Singh's testimony was identical in many respects to the declarations from other cases presented by DHS. Here again, the IJ clearly gave Singh, through counsel, the opportunity to respond and explain the obvious similarities.

Finally, the IJ considered the totality of the circumstances and had substantial evidence to find that Singh lacked credibility because of the nearly identical stories. The IJ looked at all the narrative and linguistic similarities between the seven declarations in DHS's exhibits and Singh's application, and he reasonably found that Singh's was a "canned claim." Singh's reliance on minor differences in otherwise nearly identical narratives does not compel the conclusion that the IJ's credibility finding was incorrect. Such minor differences do not outweigh the overwhelming similarities that appear in the language and stories, when considering the totality of the circumstances.

Singh also argues that the IJ failed to consider certain documentary evidence that, independent of his own discredited testimony, separately establishes the facts underlying his claims. He alleges that the IJ failed to consider (1) an affidavit from the village doctor attesting that he treated Singh after he was beaten, (2) an affidavit from a farmer who rescued him, (3) a letter from Singh's father describing how he accompanied Singh to the police station, and (4) country conditions evidence. Although the IJ did not engage in an extended separate discussion of this evidence, that does not indicate the IJ breached his duty to consider the totality of the circumstances. The IJ explicitly stated that he had "listened carefully to discussions regarding the various affidavits submitted" in Singh's prehearing statement and had examined Singh's "articles regarding Sikh youths in the Punjab state of India" and the "country reports about India." The IJ merely concluded (and the BIA agreed) that Singh's separate evidence "did not otherwise rehabilitate his discredited testimony or independently satisfy his burden of proof" for his asylum and withholding claims. The record

does not compel that Singh's independent evidence alone mandates a conclusion other than the agency's.[4]  *See Umana-Escobar*, 69 F.4th at 550.

### d. The Agency's Frivolous Application Finding was Appropriate.

The BIA also did not err in concluding that Singh filed a frivolous application for asylum and withholding of removal.  A finding of frivolity "does not flow automatically from an adverse credibility determination," *Khadka v. Holder*, 618 F.3d 996, 1002 (9th Cir. 2010) (quoting *Liu v. U.S. Dep't of Just.*, 455 F.3d 106, 113 (2d Cir. 2006)), and the agency must adhere to four procedural safeguards before making such a finding.  First, the agency must give the applicant "notice of the consequences of filing a frivolous application." *Ahir v. Mukasey*, 527 F.3d 912, 917 (9th Cir. 2008).  Second, the agency must "make specific findings that the applicant knowingly filed a frivolous application."  *Id.* Third, the agency's findings "must be supported by a preponderance of the evidence."  *Id.*  And fourth, "the applicant must be given sufficient opportunity to account for any discrepancies or implausibilities in his application."  *Id.* The IJ complied with all four procedural safeguards in this case.

First, during Singh's initial hearing, the IJ warned him "[i]f you knowingly file a frivolous application for asylum, you could be forever prevented from ever receiving any

---

[4] Singh also contends that he should have been permitted to provide additional corroborative evidence.  But an IJ is only required to seek corroborative evidence when an applicant is otherwise credible but "has not yet met his burden of proof."  *Ren v. Holder*, 648 F.3d 1079, 1093 (9th Cir. 2011).  Here, Singh was found to be noncredible.  The IJ was therefore not required to accept additional corroborative evidence.

benefits under immigration laws for the rest of your life." The IJ also provided Singh with the definition of "frivolous" and specifically asked him if he understood what the IJ was saying. Singh affirmed that he did. Thus, the first procedural safeguard was satisfied.

Second, after the government presented the substantially similar declarations from other applicants in its rebuttal exhibit, the IJ set a second hearing to give Singh's counsel additional time to look at the declarations and respond. After hearing the response and additional evidence presented by Singh's counsel, the IJ specifically determined "that [Singh] knowingly filed a frivolous application after proper notice." And in his decision, the IJ reiterated that it was clear Singh's declaration was "not only not genuine, but it was knowingly submitted, rehearsed, and fabricated for the purposes of attaining asylum under false pretenses." The IJ therefore adhered to the second procedural safeguard.

Third, the IJ observed the striking narrative, linguistic, and factual similarities between Singh's declaration and those presented by DHS, and he explained the similarities were such that "if these claims were fingerprints, they would match." The IJ determined "[i]t simply strains credulity" to think that such similarities were coincidental.

Singh again argues that there are minor differences between the other asylum declarations presented by the government and his own declaration, such as that he was merely threatened and not attacked during the first encounter, and that he was struck on different parts of his body than other applicants were during his second encounter. But these minor factual differences do not overcome the substantial narrative and linguistic similarities cited in support of the agency's frivolousness finding. The

agency's finding was supported by a preponderance of the evidence, and the third procedural safeguard was therefore satisfied.

Fourth, and as discussed above, once the government presented the declarations from other applications as its evidence that Singh had filed a "canned claim," the IJ promptly made arrangements for an additional hearing in order to allow Singh's counsel sufficient time to examine the government's evidence and respond accordingly. Among other things, *Matter of R-K-K-* and its bearing on asylum applications were discussed both by the judge and by counsel. The IJ made sure that Singh was allowed an opportunity to account for the similarities between his application and those presented by the government, satisfying the fourth procedural safeguard. The agency thus permissibly found that Singh knowingly filed a frivolous application.

### e. Substantial Evidence Supports the Denial of CAT Protection.

The IJ's determination that Singh was not entitled to CAT protection is likewise supported by substantial evidence. To be eligible for CAT relief, an applicant must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "Torture" is a term "reserved for extreme cruel and inhuman treatment that results in severe pain or suffering." *Tzompantzi-Salazar v. Garland*, 32 F.4th 696, 706 (9th Cir. 2022). This torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity," 8 C.F.R. § 208.18(a)(1), and the risk of torture must be particularized

to the individual. *See Dhital v. Mukasey*, 532 F.3d 1044, 1051–52 (9th Cir. 2008).

While the evidence in the record indicates that there was "strife in India," once Singh's own testimony was disregarded, there was not enough individualized evidence to compel the conclusion that there was a greater than fifty-percent chance that Singh himself would be tortured upon removal to India. Singh referenced general corruption of public officials in India and presented country conditions evidence, but he presented no actual, individualized evidence that he would be tortured by or with the acquiescence of the Indian government if he were removed to India. Consequently, substantial evidence supports the Board's determination that Singh was not entitled to CAT protection. *See Dhital*, 532 F.3d at 1051–52.

## IV.  CONCLUSION

The agency's finding that Singh was not credible was supported by substantial evidence, as was its denial of asylum, withholding, and CAT relief. And the agency followed all procedural safeguards when it properly found that Singh knowingly filed a frivolous application for asylum and withholding of removal. We therefore deny the petition for review.

**PETITION DENIED.**

---

BRESS, Circuit Judge, with whom VANDYKE, Circuit Judge, and LASNIK, District Judge, join, concurring:

This case involves the question of when an immigration judge (IJ) can conclude, based on strikingly similar accounts of persecution made in different cases, that a petitioner who

advances the same account is not credible. In *Singh v. Garland*, 118 F.4th 1150 (9th Cir. 2024), a panel of this court narrowly construed the circumstances under which such an adverse credibility determination is permissible, holding that across supporting affidavits, there must be "the use of identical words or phrases, distinct language and grammar, or other cues that suggest the affidavit was plagiarized." *Id.* at 1156. *Singh v. Garland* acknowledged that a similar "narrative structure" across the accounts of different applicants could support an adverse credibility finding. *Id.* at 1161. But *Singh v. Garland* either required plagiarized language in those circumstances, or else it construed the concept of "narrative structure" so narrowly as to exclude narratives that were, in fact, substantially identical.

Today's decision faithfully applies and distinguishes *Singh v. Garland*, because in this case the government demonstrated that the petitioner's declaration contained both identical verbiage and a substantially identical narrative structure, as compared to other declarations filed by similarly situated applicants from India. But our decision in *Singh v. Garland* was wrong and requires re-examination. By effectively insisting upon the specific use of identical language across affidavits, *Singh v. Garland* unduly cabined the circumstances in which IJs are permitted to recognize that a petitioner's account is not credible, even when the account distinctively tracks the nearly identical accounts of other petitioners from the same region. Copy-and-pasted language from another affidavit is surely one indicator that a petitioner is not credible. But it can hardly be considered a requirement. Judge N.R. Smith's compelling dissent in *Singh v. Garland* was right: nothing "suggests that IJs should be limited to such a narrow basis for assessing credibility."

*Singh v. Garland*, 118 F.4th at 1175 (N.R. Smith, J., dissenting).

This case involves a petitioner from India who claims to be a member of the Mann Party advocating for Sikh rights. The specific two-incident set of allegations—down to the sequence of events and numerous extraneous details—are ones that we have encountered in other past cases brought by Mann Party members. The alleged account of persecution in *Singh v. Garland* is substantially identical to the account advanced here. And in both this case and *Singh v. Garland*, the government gathered numerous examples of past declarations from Mann Party members that all advanced substantially the same two-incident narrative.

Contrary to *Singh v. Garland*, even without plagiarized language, the accounts offered in these cases do not reflect "broad factual similarities that could be present in countless asylum applications." *Singh v. Garland*, 118 F.4th at 1163; *see also id.* at 1178 (N.R. Smith, J., dissenting) ("My colleagues' desire to require identical language or evidence of plagiarism before an IJ can question an applicant's credibility is just their basis for substituting their judgment of the applicant's credibility for that of the IJ."). The IJ in this case was therefore fully justified in finding that "there are numerous repeated evidentiary points raised by [petitioner] that match (sometimes word for word) aspects of other claims in other cases," and that "so many other claims have raised the exact same factual pattern." As the IJ commented, "[i]t simply strains credulity that this many claims would have the same fact pattern over and over again."

Once the petitioner is given notice and an opportunity to respond, as he was here, this observation should have been

sufficient to justify an adverse credibility finding even in the absence of specifically plagiarized text in supporting affidavits. In effectively requiring such identical words or phrases, *Singh v. Garland* purported to locate its rule of decision in the Board of Immigration Appeals (BIA) opinion in *Matter of R-K-K-*, 26 I. & N. Dec. 658 (B.I.A. 2015). *See Singh v. Garland*, 118 F.4th at 1160–63 ("We conclude that the agency misapplied *Matter of R-K-K-*."). But that is a misreading of *R-K-K-*.

Although *R-K-K- involved* plagiarized text borrowed from other affidavits, it certainly did not *require* "linguistic or grammatical similarities," as *Singh v. Garland* thought. *Id.* at 1162. Instead, the BIA in *R-K-K-* said that "the presence of even a relatively few similarities could raise the same credibility concerns if, in the context of an overall asylum claim, distinct language was used *or unique factual circumstances* were repeated without reasonable explanation." 26 I. & N. Dec. at 662 (emphasis added); *see also Singh v. Garland*, 118 F.4th at 1175 (N.R. Smith, J., dissenting) ("My colleagues interpret *Matter of R-K-K-* too narrowly."). *R-K-K-*'s instruction that IJs "should take a commonsense approach to determining credibility, considering the totality of the circumstances," 26 I. & N. Dec. at 659, is inconsistent with *Singh v. Garland*'s focus on specifically plagiarized words or phrases.

Given that *Singh v. Garland* rests on an erroneous reading of *Matter of R-K-K-*, the BIA could clarify the scope of *Matter of R-K-K-* in a future case and thereby override *Singh v. Garland*'s misinterpretation of the decision. Alternatively, our en banc court could take up the matter in an appropriate case. The verbatim plagiarism across affidavits present in this case allows us to vindicate the IJ's refusal "to suspend disbelief," along with the IJ's well-

supported determination that the petitioner is not credible. But *Singh v. Garland* troublingly vindicates petitioners who advance uncannily similar factual allegations, but who do so without making the overtly revealing misstep of borrowing language verbatim from a declaration in another case.

We should allow IJs the necessary latitude to find that petitioners in those circumstances are not credible. *Singh v. Garland* was incorrectly decided and should be rejected.